**UNITED STATES COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| D.J.C.V, a minor, and Mr. C.<br><br>*Petitioners,*<br><br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); L. Francis Cissna Director of USCIS; JEFFERSON B. SESSIONS III, Attorney General of the United States; KIRSTJEN M. NIELSEN, Secretary, U.S. Department of Homeland Security; RONALD VITIELLO, Deputy Director and Senior Official Performing the Duties of Director, U.S. Immigration and Customs Enforcement; KEVIN K. MCALEENAN, Commissioner, U.S. Customs and Border Protection; ALEX M. AZAR II, Secretary, U.S. Department of Health and Human Services; SCOTT LLOYD, Director, Office of Refugee Resettlement; THOMAS DECKER, ICE Field Office for Enforcement and Removal Operations in New York; Orange County Correctional Facility; ANTHONY MELE, Colonel of Orange County Correctional Facility; and Lutheran Social Services of New York,<br><br>*Respondents.* | **Case No.**<br><br>**Hon.** |

**PETITION FOR WRIT OF HABEAS CORPUS AND OTHER DECLARATORY AND INJUNCTIVE RELIEF**

Petitioners D.J.C.V., a minor, and his father Mr. C., by and through their undersigned counsel Morgan Lewis & Bockius LLP and the Center for Constitutional Rights, respectfully petition this Court for a writ of habeas corpus, pursuant to 28 U.S.C. §§ 2241 and 2243, as well

as the All Writs Act, 28 U.S.C. § 1651, and submit a complaint and request for a preliminary injunction pursuant to Fed. R. Civ. P. 65 to secure Petitioners' release from unlawful detention, and reunification of Mr. C. with his two-year old child, as well as an order for a stay of Petitioners' removal.[1]

**PRELIMINARY STATEMENT**

1. Mr. C., an adult citizen of Honduras who faces a well-founded fear of persecution and torture should he return, brings this action to end his unlawful, indefinite detention in the Orange County Correctional Facility, and the unlawful, indefinite detention of his two-year old son, D.J.C.V., from whom he has been unlawfully separated for nearly six months without *any* contact, and to reunify their family unit.

2. Mr. C. and his son fled from Honduras, where they faced serious harm or death at the hands of the MS-13 cartel and other gang members, and entered the United States in April 2018, immediately seeking asylum and/or *nonrefoulement* to torture at home. Soon after, and pursuant to the Trump Administration's cruel "zero tolerance" and family separation policy, which is designed to deter future asylum seekers by inflicting maximum cruelty on thousands of families successfully entering the United States, Respondents took his 19-month old son away from him, and threatened him with deportation.[2] Since that time, Respondents have taken a

[1] Petitioners have filed concurrently herewith a motion for permission to proceed anonymously using their initials. Respondents know Petitioners' identities.

[2] As described below, Petitioners have been deemed not to be class members and therefore subject to the injunction issued in *Ms. L. v. U.S. Immigration and Customs Enforcement*, 310 F. Supp. 3d 1133, 1137 (S.D. Cal. 2018). As a result, Respondents are not directly bound in this case by the injunction issued against the type of forced separation deemed unlawful in *Ms. L.* Nevertheless, the due process principles implicated in that case are applicable here as well. Petitioner D.J.C.V. is, however, undisputedly a class member subject to the provisions of a settlement agreement reached in *Flores v. Reno*, No. CV 85-4544-RJK(Px), Settlement Agreement (C.D. Cal. Jan. 28, 1997), which offers special protections to minors held in immigration custody and by the Agreement's own terms is separately enforceable in this Court.

number of meritless legal positions all designed to ensure the continuing – albeit unlawful – detention of Mr. C. and the needlessly cruel separation from his infant son, who is also detained: Respondents have denied Mr. C.'s paternity, despite being presented with an authentic birth certificate proving his legal parentage; Respondents have refused to release him on the grounds of a meritless invocation of a "criminal history" which consists of an eight year old misdemeanor conviction that does not arise to the mandatory detention criteria under the Immigration and Naturalization Act ("INA"). They have not afforded Mr. C. a bond hearing, instead offering false hope about Respondents' plans to reunify and an ultimately fictitious hearing date that did not come to pass.

3. Most notably, however, and mindful of the continuing trauma that this forced separation has caused, Respondents have sought to coerce Mr. C. to abandon his rightful claims to protections under asylum law and the Convention Against Torture ("CAT"), by conditioning any reunification with his son upon his agreement for both to be removed to Honduras. Thus, Respondents have thus sought to force Mr. C. to choose between indefinite detention without any access to his baby son on the one hand and, on the other, reunification with his son under very serious risk to their lives in Honduras.

4. By initiating and continuing the forced separation of father and son, Respondents are knowingly causing Petitioners to endure wrenching trauma – a severe mental pain or suffering that meets the statutory and international law definitions of torture – that will have lasting psychological impacts on both. The trauma is particularly acute and lasting in the case of Petitioner D.J.C.V., who recently turned two years old in detention, and who will remain in detention, alone without any access to his father, in a foreign country, with little or no ability to communicate in *any* language with anyone because he is too young. Indeed, his present situation

is so precarious that if judicial relief is not granted immediately, he may not remember his father or be able to re-establish a familial bond with his father – or any other family member – because he has already spent a substantial portion of his life in detention in the United States. Because there is no one else in the United States who can or will take custody of Petitioner D.J.C.V., he will remain in detention absent judicial relief, potentially until he is forcibly removed from the United States or, if he is eventually granted asylum, his father's parental rights may be involuntarily terminated placing him permanently in foster care or adopted.

5. Petitioner Mr. C. has also been harmed by the ongoing forced separation, which has caused him unbearable anguish and grief as well as fear for his son's mental, emotional, and physical well-being. Respondents have not claimed, and could not credibly claim, that reunification would not be in the best interests of the child; in fact, their actions are in defiance of findings of a federally appointed guardian ad litem, who has consistently taken the position that reunification of father and child is necessary for the well-being of the child.

6. Respondents' detention of Mr. C. and cruel, pretextual separation of Mr. C. from his son is unlawful. Indefinite, noncriminal detention for purposes of punishment, deterrence, and coercion violates the most elementary protections of the Due Process Clause. Indeed, this detention, which is undertaken to inflict severe mental pain and suffering in order to coerce Mr. C.'s abandonment of his rights, constitutes torture and cruel, inhuman, and degrading treatment under the Due Process Clause and international law. The detention and forced separation of father and child also violates procedural due process, the INA, the Administrative Procedure Act ("APA"), as well as the special protections afforded to minors in the custody of United States immigration authorities pursuant to the settlement in *Flores v. Reno*, No. CV 85-4544-RJK(Px), Settlement Agreement (C.D. Cal. Jan. 28, 1997) (the "Flores Settlement Agreement" or "FSA").

The discriminatory animus driving Respondents' cruel family separation and asylum deterrence policies also violates the Equal Protection guarantees of the Fifth Amendment.

7. The United States government cannot lawfully inflict such serious, gratuitous cruelty on a parent and infant child to advance narrow policy goals. Petitioners are suffering unbearable and irreparable harm from the trauma of this family separation practice. Immediate court intervention is necessary to ensure the government complies with law and to prevent continuing irreparable harm to Petitioners.

**JURISDICTION**

8. This Court has habeas jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2243 (habeas jurisdiction), as well as equitable, common law habeas authority. The Court also has jurisdiction to grant relief pursuant to 28 U.S.C. § 1331 (federal question jurisdiction, with a waiver of sovereign immunity pursuant to the APA, 5 U.S.C. § 701 et seq.); 28 U.S.C. § 1346 (United States as defendant); 28 U.S.C. § 1651 (All Writs Act); 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act); and ¶ 24(B) of the FSA, a consent decree to which the United States government is a party and D.J.C.V. is a protected class member. Petitioners are in Respondents' custody for purposes of habeas jurisdiction.

**VENUE**

9. Petitioner D.J.C.V. is presently detained in the Southern District of New York by Respondent Office of Refugee Resettlement ("ORR") through Lutheran Social Services of New York ("LSSNY") in the Bronx, New York.

10. Petitioner Mr. C. is presently detained in the Southern District of New York in Orange County Correctional Facility ("OCCF"), in Goshen, New York.

11. Venue in the Southern District of New York is proper under 28 U.S.C. § 1391 because Petitioner Mr. C. is detained in this District, Petitioner D.J.C.V. is detained in this District, and a substantial portion of the relevant events occurred within this District.

12. Venue is also proper pursuant to the FSA consent decree, which provides that D.J.C.V. "may seek judicial review in any United States District Court with jurisdiction and venue over the matter" to challenge his placement by DHS and the conditions of his placement. FSA ¶ 24B.

**PARTIES**

13. Petitioner D.J.C.V. is a two year-old boy from Honduras. He was only nineteen months old when he entered the United States with his father. This action is brought on his behalf, under the authority of his father, Petitioner, Mr. C.

14. Petitioner Mr. C. an adult male also from Honduras. Together with D.J.C.V., they fled Honduras seeking protection from persecution they suffered and fear they will continue to suffer if they are forced to return to Honduras.

15. Respondent U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS responsible for carrying out removal orders. Through an Inter-Governmental Service Agreement, ICE detains alleged noncitizens at the OCCF.

16. Respondent Department of Homeland Security ("DHS") enforces the immigration laws of the United States.

17. Respondent U.S. Customs and Border Protection ("CBP") is a sub-agency of DHS responsible for the initial processing and detention of noncitizens who are apprehended near the U.S. border.

18. Respondent U.S. Citizenship and Immigration Services ("USCIS") is the sub-agency of DHS that, through its Asylum Officers, conducts interviews of certain individuals to

determine whether they have a reasonable fear of persecution and should be permitted to apply for asylum, protections under CAT, and/or withholding of removal.

19. Respondent U.S. Department of Health and Human Services ("HHS") is a department of the executive branch of the U.S. government.

20. Respondent ORR is a component of HHS, which is supposed to provide care of and placement for unaccompanied noncitizen children.

21. Respondent Jefferson B. Sessions III is the Attorney General of the United States and the head of the United States Department of Justice ("DOJ"). In that capacity, he has responsibility for the administration of immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office of Immigration Review, and is empowered to grant asylum or other relief. He is sued in his official capacity.

22. Respondent Kirstjen Nielsen is the Secretary of DHS, and has responsibility for the administration and enforcement of the immigration laws pursuant to 8 U.S.C. § 1103. She directs each of DHS's component entities: CBP, ICE, and USCIS, and has the power to grant asylum or other relief. She is sued in her official capacity.

23. Respondent Ronald Vitiello is the Deputy Director and Senior Official Performing the Duties of Director of ICE, and in that capacity, has direct authority over all ICE policies, procedures and practices relating to the detention and deportation of noncitizens. He is sued in his official capacity.

24. Respondent Kevin K. McAleenan is the Commissioner of CBP, and in that capacity, has direct authority over all CBP policies, procedures and practices relating to the apprehension of asylum seekers and the decisions by CBP to separate families. He is sued in his official capacity.

25. Respondent Alex M. Azar II is the Secretary of HHS, and in that capacity, has ultimate responsibility for the physical care and daily detention of minors in the custody of immigration authorities without their parents. He is sued in his official capacity.

26. Respondent Scott Lloyd is the Director of the ORR, and in that capacity, has direct authority over all ORR policies, procedures, and practices relating to the physical care and daily detention of minors detained without parents in ORR facilities. He is sued in his official capacity.

27. Respondent Thomas Decker is the Director of the ICE Field Office for Enforcement and Removal Operations in New York, New York. He exercises authority over ICE activities in the New York region. He is sued in his official capacity.

28. Respondent OCCF is where the Petitioner Mr. C. is currently detained. It is the entity ultimately responsible for the local policies, procedures and practices relating to the detention of Mr. C., including but not limited to lack of access to communication or visitation with his son, D.J.C.V. The facility is charged with and has direct authority over the physical care and daily detention of Mr. C., separate and apart from his infant son, D.J.C.V.

29. Respondent Anthony Mele is the Colonel of OCCF. He is charged with and has direct authority over the physical care and daily detention of Mr. C., separate and apart from his son. He is sued in his official capacity.

30. Respondent LSSNY is an ORR shelter that is currently detaining D.J.C.V. away from his father. The center is charged with and has direct authority over the physical care and daily detention of Petitioner, D.J.C.V.

## BACKGROUND

### A. Father and Son's Flight from Persecution in Honduras

31. Petitioners fled Honduras to escape explicit death threats from members of gangs that dominate public life in Honduras and operate largely with impunity.[3] MS-13 gang members had kidnapped and held Mr. C. at gun point, threatening his life and the life of his baby. Mr. C. has also received explicit death threats from gang members that already killed multiple members of Mr. C.'s extended family.

32. Although Mr. C. is not the child's biological father, he is D.J.C.V.'s legal father and the only father he has ever known. Mr. C. began caring for D.J.C.V. the day he was brought home from the hospital after his birth, and has been his true father in every sense – changing diapers, feeding him, playing with him, and providing all financial support. Mr. C. is also listed as D.J.C.V.'s legal father on his birth certificate, which confers all parental rights under Honduran law.

33. On or about April 30, 2018, Petitioners encountered border officials at the southern border of the United States. Immediately upon meeting border officials, Mr. C. asserted

---

[3] Petitioners' flight is part of a humanitarian crisis occurring in what is frequently referred to as the Northern Triangle, consisting of Honduras, Guatemala and El Salvador. *See* Christina Eguizábal et al., *Crime and Violence in Central America's Northern Triangle*, The Wilson Ctr., 2 (2015), https://www.wilsoncenter.org/sites/default/files/FINAL%20PDF_CARSI%20REPORT_0.pdf. The "pervasive and systematic levels of violence" associated with the increasing reach of gangs in the Northern Triangle have been well documented. UNHCR, *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico*, 15 (2015), http://www.unhcr.org/enus/publications/operations/5630f24c6/women-run.html. *See also* MSF, *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis*, 8 (2017), https://www.msf.org/sites/msf.org/files/msf_forced-to-flee-central-americas-northern-triangle_e.pdf (finding that citizens of Northern Triangle countries are "murdered with impunity"). Thousands have fled these countries, citing "violence [from] criminal armed groups, including assaults, extortion, and disappearances or murder of family members." *Women on the Run*, at 15.

a fear of return to Honduras. He also provided to the officials a certified copy of D.J.C.V.'s birth certificate and a letter from the child's mother, sworn to in front of a Honduran court, permitting D.J.C.V. to travel with Mr. C.

34. Mr. C. and D.J.C.V., 19 months old at the time, were taken into custody by border officials and spent the first three days in detention together.

35. On or about May 2, 2018, officials accused Mr. C. of being a criminal, and told him to say goodbye to his son because they were taking him away and that he would be deported. Mr. C. cried as he watched officials take his 19 month-old baby away from him. Mr. C.'s "criminal history" consists of a single state misdemeanor from approximately eight years ago.[4] There is no indication whatsoever that Mr. C. presents a danger to his child or is otherwise unfit to parent, and Respondents have never made any such claim in defense of taking his child from him.

36. May 2, 2018 was the last time Mr. C. saw, or heard from, his son.

### B. Respondents' "Family Separation" Policy To Punish, Coerce, And Deter Non-Citizens From Exercising Their Rights Under U.S. And International Law To Seek Asylum And Other Immigration Protections

37. Trump Administration officials have devised and implemented a policy and practice of separating family units upon their entry into the United States and inflicting the corresponding cruelty, uncertainty, and trauma from such a rendition, for the express purpose of deterring future asylum seekers from seeking lawful refuge in this country. This has been

[4] On October 28, 2010, Mr. C. pled guilty to misdemeanor aggravated assault in Louisiana. LA Rev Stat § 14:37. The incident did not involve any physical contact or harm to another; under Louisiana law, assault is defined as "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." LA Rev Stat § 14:36. The maximum penalty for the misdemeanor of which Mr. C. was convicted under Louisiana law is a fine of up to $1,000, a term of imprisonment not more than six months, or both. LA Rev Stat § 14:37. Mr. C. was sentenced to only 48 days (time served at the date of sentencing).

commonly referred to as a "Family Separation Policy."[5] Similarly, after separating families from vulnerable children already traumatized from their flight from persecution, Administration officials have engaged in a practice of conditioning any reunification upon a coercive withdrawal of their right to seek lawful entry in the United States. As described below, Petitioners have been subjects of this coercive, torturous, and unlawful practice.

38. As DHS's Office of the Inspector General has reported, before implementation of the Zero Tolerance Policy and the consequent Family Separation Policy, "when CBP apprehended an alien family unit attempting to enter the United States illegally, it usually placed the adult in civil immigration proceedings without referring him or her for criminal prosecution. CBP only separated apprehended parents from children in limited circumstances — e.g., if the adult had a criminal history or outstanding warrant, or if CBP could not determine whether the adult was the child's parent or legal guardian. Accordingly, in most instances, family units either remained together in family detention centers operated by ICE while their civil immigration cases were pending, or they were released into the United States with an order to appear in immigration court at a later date." Office of the Inspector General, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy*, OIG 18-84, 2 (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf (hereinafter "OIG Report").

39. United States law entitles non-citizens on American soil to seek asylum and withholding of removal. 8 U.S.C. § 1158. Since 1996, immigration law has also provided

---

[5] *See, e.g.*, Salvador Rizzo, *The Facts About Trump's Policy of Separating Families at the Border*, Washington Post (June 19, 2018), https://www.washingtonpost.com/news/fact-checker/wp/2018/06/19/the-facts-about-trumps-policy-of-separating-families-at-the-border/.

authority for "expedited removal," or the removal of certain individuals from the United States without a removal hearing. 8 U.S.C. § 1225(b)(1)(A)(i).

40. Even an individual subject to expedited removal, however, must receive a removal hearing if the person "indicates either an intention to apply for asylum . . . or a fear of persecution." *Id*. Under such circumstances, an asylum officer evaluates whether the individual has a "credible fear" of persecution in their home country (§ 1225(b)(1)(A)(ii)), or, if the individual has been previously removed, a "reasonable fear" of persecution in their home country. 8 C.F.R. § 208.31. If an asylum officer determines that there is a "significant possibility" that such an individual could prove eligibility for fear-based relief, 8 U.S.C. § 1225(b)(1)(B)(v), then the asylum seeker is placed into regular removal proceedings. *Id.* § 1225(b)(1)(B)(ii).

**1. Family Separation to Deter Asylum Seekers**

41. In early 2017, DHS contemplated instituting a policy of separating asylum-seeking families at the border in order to deter migration from Central America into the United States. In March 2017, then-DHS Secretary John Kelly stated that he was considering separating arriving children from their parents "in order to deter more movement" into the United States.[6] On April 6, 2018, Respondent Sessions released a memorandum to "Federal prosecutors along the Southwest border" entitled "Zero Tolerance for Offenses Under 8 U.S.C. 1325(a) [illegal entry]."[7] Available at https://www.justice.gov/opa/press-release/file/1049751/download. On

---

[6] *See* John Haltiwanger, *John Kelly Proposed Separating Children from Their Parents to Deter Illegal Immigration Last Year, and Now the Trump Administration Can't Get Its Story Straight*, Business Insider, June 20, 2018; Jonathan Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids from Their Parents*, The New Yorker, May 30, 2018.

[7] Even though Petitioner Mr. C. was not prosecuted for a violation of Section 1325(a), his child was still taken from him under other pretextual and unsupported reasons, pursuant to the Trump

April 23, 2018, Secretary Nielsen signed off on a policy to separate families in conjunction with the "Zero Tolerance" prosecution policy, with the explicit goal of having an impact on "current flows," that is, deterring migration. *See* Cora Currier, *Prosecuting Parents – And Separating Families – Was Meant to Deter Migration, Signed Memo Confirms*, The Intercept (Sept. 25, 2018), https://theintercept.com/2018/09/25/family-separation-border-crossings-zero-tolerance/.

42. Shortly thereafter, the government began widespread implementation of a program to separate parents from children at the U.S.-Mexico border. *See* OIG Report at 3-4 (stating that 2551 children over the age of 5 and 103 children under the age of 5 had been separated from parents and "initially deemed eligible for reunification"). Accordingly, government enforced the separation of Petitioners on May 2, 2018, just days after the formal adoption of the Family Separation Policy. The government applied its "zero-tolerance policy" of prosecution against parents who crossed the border with their own children. But it also applied its policy of separating families against those whom it did not choose to prosecute, including Mr. C. Respondents have forcibly separated thousands of children from their parents at the border, many, like D.J.C.V., under the age of 5.[8]

43. Children forcibly separated from their parents were transferred to the custody of ORR, a component of HHS, and sent to shelters, temporary housing, and foster care. ORR deems these children "unaccompanied alien children." OIG Report at 3. For periods lasting weeks or months, ORR did not give parents information about their children's well-being or whereabouts or even facilitate communication by telephone. OIG Report at 13-14 (reporting detained parents' difficulties in accessing information about their separated children's location

Administration's broader goal of punishing families entering the United States in order to deter future migration here.

[8] The Administration deemed hundreds of additional separated children "not eligible for reunification." OIG Report at 3-4 n.7.

and government's failure to assist parents in communicating or locating with their children). *See also Ms. L.*, 310 F. Supp. 3d at 1137 (finding that "[m]easures were not in place to provide for communication between governmental agencies responsible for detaining parents and those responsible for housing children, or to provide for ready communication between separated parents and children.").

**2. Family Reunification Only on Condition of Removal**

44. Facing widespread public condemnation of coerced family separation as a grave violation of American values, President Trump purportedly retracted the policy on June 20, 2018. *See* Exec. Order No. 13,841, *Affording Congress an Opportunity to Address Family Separation*, 83 Fed. Reg. 29,435, 2018 WL 3046068 (June 20, 2018) (hereinafter "EO"). The EO continued the policy of initiating criminal proceedings for all individuals who crossed the border without authorization; however, in place of systematic separation of families, the EO called for indefinite detention of families in camps and makeshift facilities. *Id.*

45. The EO made no provisions for reunification of families who, like Petitioners, had already been separated prior to June 20, or to remediate any trauma that had been caused by the family separation policy. Indeed, federal officials have stated that those children would not be reunited with their families while their parents were in federal custody during immigration proceedings, as there would "not be a grandfathering of existing cases."[9]

46. Written policies implementing the EO reveal that reunification of families would only occur at the point of removal. A Fact Sheet issued by DHS on June 23, 2018, explicitly

[9] Michael Shear, Abby Goodnough & Maggie Haberman, *Trump Retreats on Separating Families, but Thousands May Remain Apart*, N.Y. Times, June 20, 2018.

states that families will be reunified with children "for the purposes of removal."[10] While providing a process for reunification upon removal, DHS makes no provision for reunification separate and apart from removal. It appears part of a practice, exemplified in this case, of correlating or conditioning reunification upon ultimate removal, and not before, and therefore having the purpose and effect of coercing individuals from forfeiting their rights to relief from deportation.

47. On June 26, 2018, a federal district court in the Southern District of California, having certified a class of adults and children who had been separated at the border, ordered DHS to cease detaining parents apart from their minor children absent a finding that the parent was unfit or a danger to the child. The Court further ordered that DHS begin reunifying children with their parents by July, a process that DHS had failed to undertake on its own. *See Ms. L.*, 310 F. Supp. 3d at 1149. Notably, this class does not include any families where the parent has any kind of "criminal" history. *Id.* at 1139 n.5. For families who are not members of the class in *Ms. L.*, DHS has not disclosed any process for reunification of families prior to removal, including during the pendency of asylum and withholding of removal claims, which may last for months.

**3. Discriminatory Animus Behind Trump's Zero Tolerance Policy**

48. The Trump Administration adopted its policy of coerced family separation as a central part of an anti-immigrant agenda, motivated primarily by racial animus against individuals of Hispanic origin and individuals from Central America and the Caribbean. Since taking office, President Trump has consistently pursued immigration policies motivated by racial

[10] *Fact Sheet: Zero Tolerance Prosecution and Family Reunification*, Dep't Homeland Sec. (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.

animus against non-European immigrants. In January 2018, President Trump complained about Temporary Protected Status for individuals from specific Central American, Caribbean and African countries, asking why the United States was admitting "all these people from shithole countries," as opposed to countries like Norway. Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, Washington Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.64e1af109661. In May 2018, the Trump Administration announced that it would be stripping such status from up to 400,000 immigrants, including tens of thousands from Honduras. Dara Lind, *Trump Tells 57,000 Hondurans Who Have Lived in the U.S. for 20 Years to Get Out*, Vox (May 4, 2018), https://www.vox.com/2018/5/4/17320352/tps-honduras-cancel-trump-temporary-protected-status. That same month, President Trump characterized certain unauthorized migrants as "animals." Jamelle Bouie, *The "Animal" Debate Is Over*, Slate (June 19, 2018), https://tinyurl.com/yckbshah. In June, defending his coerced family separation policy, the President alleged that families crossing the border with their children "could be murderers and thieves and so much else," and warned that "[t]he United States will not be a migrant camp. . . ." *Id.*

49. The Trump Administration's shifting race-neutral explanations for coerced family separation are pretextual. President Trump falsely asserted that family separation was required under an unnamed law. *See* Julie Hirshfeld Davis, "Trump Again Falsely Blames Democrats For His Separation Tactic," New York Times (June 16, 2018), available at https://www.nytimes.com/2018/06/16/us/politics/trump-democrats-separation-policy.html. Yet he unilaterally ended the policy through an executive order a few days later, on June 20, 2018.

DHS Secretary Nielsen claimed that the policy was necessary due to arriving adults and children fraudulently claiming to be family units, but less than one percent of families apprehended at the border made such fraudulent claims. Linda Qiu, *Fact-Checking the Trump Administration's Case for Child Separation at the Border*, N.Y. Times (June 19, 2018), https://tinyurl.com/yddv5oef. And, although President Trump falsely asserted that 80 percent of individuals who were released pending immigration hearings failed to appear, most such individuals do in fact appear for their immigration hearings. Noah Bierman, Sarah D. Wire, & Eli Stokols, *Trump Orders End to His Family Separation Policy at the Border, but Relief Could Be Temporary*, L.A. Times (June 20, 2018), https://tinyurl.com/yaq2a2hg.

50. In class action litigation in the U.S. District Court for the Southern District of California, Respondents did not dispute that they had "no plans or procedures in place to reunify the parent with the child other than arranging for them to be deported together after the parent's immigration case is concluded." *Ms. L.*, 310 F. Supp. 3d at 1142. While the Court in that case has ordered the reunification of class members, Mr. C. and D.J.C.V. are not members of the plaintiff class, and DHS has not articulated any policy to reunite them.

**C. The Government's Shifting, Pretextual Bases for Denying Mr. C Access to His Infant Son.**

51. After government authorities took his infant son from him, Mr. C. waited for weeks and weeks without any information regarding the whereabouts or condition of his son. During that time, D.J.C.V. was being held – and still is to this day – in the custody of ORR. On information and belief, he is taken to a detention facility from 7 am until 5:30 pm each day, and spends the night with a foster parent appointed through ORR.

52. In the early days of separation from his son, Mr. C. met with unknown officials and began speaking further about his fear of returning to Honduras. He was not permitted to

finish providing the information. He was extremely concerned about his son, and asked the officials about him. At that time, he was presented with a piece of paper and told that he could see his son again if he signed the paper. In a moment of desperation and fear, Mr. C. agreed. Upon information and belief, the paper he signed was some sort of withdrawal of his application for withholding of removal.[11]

53. Shortly after that meeting, following a brief consultation with local pro-bono counsel, he wrote to ICE officials requesting that he continue his asylum/withholding application. He received letters on or about June 16 and 22, 2018 stating that he would be provided with an interview regarding his asylum application.

54. In early July 2018, Mr. C. was told that he was being transferred to Hudson County Correctional Center ("HCCC") to be reunited with his son.

55. Shortly after arriving at HCCC, officials met with him seeking a cheek swab. Mr. C. explained to them that his DNA would not match D.J.C.V.'s, but the officials insisted on doing the DNA test regardless.

56. In the ensuing weeks, Respondents DHS and ORR have taken a series of alternative positions with regard to the relationship between Mr. C. and his son, whether they will be reunited, and the status of their applications for asylum, CAT, or withholding.

---

[11] The practice of coercing asylum applicants sign waivers has been well-documented. *See* B. Shaw Drake et al., *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers*, Human Rights First, 16 (2017), http://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf. *See also* Cplt, ¶¶19, 20 21, *Al Otro Lado v. Duke*, No. 2:17-cv-05111 (C.D. Cal. July 12, 2017) (Dkt. No. 1) (documenting well-plead instances where asylum seekers were coerced to sign waivers of their right to asylum, often based on a threat of family separation); *see also* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss at 5-6, *Al Otro Lado v. Nielsen*, No. 3:17--cv-2366 (S.D. Cal. Aug. 20, 2018) (Dkt. No. 166) (describing well-plead allegations of coerced asylum withdrawals).

57. On July 13, 2018, Mr. C. engaged counsel. On July 17, 2018, counsel was informed by Mr. C.'s assigned Deportation Officer ("DO") that Mr. C. had claimed fear and he would submit Mr. C. for an interview with USCIS once counsel and ICE were able to resolve ICE's questions about his family situation. The DO also stated that, if Mr. C.'s A-file did not arrive in New York in time for the reunification of father and son, Mr. C. would be released and told to return for his interview. The DO also confirmed that Mr. C. was brought to HCCC to be reunited with his son.

58. To Mr. C.'s shock and horror, on July 19, 2018, an ORR representative stated that Mr. C. and D.J.C.V. were not family because their DNA did not match. ORR also questioned Mr. C's credibility because, they alleged, he was untruthful in calling himself D.J.C.V.'s father. Mr. C. has never been anything but truthful in stating that he is, both legally and in fact, D.J.C.V.'s father.

59. ORR represented that it was in possession of D.J.C.V.'s birth certificate, and had confirmed its authenticity.

60. ORR reversed its position on July 27, 2018 after being presented with additional evidence of Mr. C.'s legal and factual parentage. At that time, ORR agreed to permit D.J.C.V. to visit his father in custody at HCCC.

61. When LSSNY and counsel attempted to arrange the visits, DHS officials initially stated that visitation required a court order. When pressed, DHS officials changed their story, once more claiming that they did not consider Mr. C. and D.J.C.V. to be a family and therefore could not visit with each other, regardless of what ORR believed.

62. On August 7, the DO informed counsel that, because DHS did not consider Mr. C. and D.J.C.V to be family (despite receiving evidence proving otherwise), Mr. C. was in the

process of being transferred back to Texas. Upon information and belief, DHS planned to process Mr. C. for removal from the United States. A supervising DO later confirmed Mr. C. was in the process of being transferred.

63. Similarly, when confronted with the prospect that a court order in *Ms. L.* would require reunification, Respondents shifted their justification for denying reunification. For the first time, they argued that the injunction in *Ms. L.*, which required migrant parents who had been separated from children under the age of 5 to be reunified by July 10, 2018, 310 F. Supp. 3d at 1149, did not cover Mr. C. because of his "criminal history." On August 9, after Mr. C.'s counsel contacted DOJ attorneys litigating the *Ms. L.* class action directly, DOJ informed counsel that "DHS does not have plans to move [Mr. C.]" and that DHS is not denying reunification "based on lack of parent/child relationship but rather is still evaluating the individual's criminal history in assessing whether he is a class member."

64. On August 14, 2018, a supervising DO informed counsel that Mr. C. was "supposed to be transferred" that day, but "something" was "on hold." She said she did not know what would happen the following day. She reiterated that Mr. C. was brought to the Northeast "for reunification," and that ICE "would like to send him home" but that the reason he was still being held was due to "reunification" and that "they were trying to reunify."

65. On an August 16, 2018 call, ORR officials informed counsel that "if reunification with Dad is possible, we'll do that." However, they said, it was ICE's position that Mr. C. was not eligible for reunification due to his criminal conviction. As a result, an ORR official encouraged the idea of sending the child back to Honduras, and indicated that counsel should speak to Mr. C. about that possibility; maybe, she commented, it would "open Mr. [C]'s eyes."

66. On August 17, 2018, DOJ informed counsel for Mr. C. that DHS does not believe that Mr. C. is part of the *Ms. L.* class due to his criminal history of a single misdemeanor in 2010. DOJ further stated that Mr. C. cannot be reunified with D.J.C.V. in custody because he is not permitted to be held in a family detention facility due to his criminal history. DOJ also stated that it was "willing to reunify and remove" if Mr. C. elected that option. Counsel questioned why Mr. C. had not yet received his reasonable fear interview as part of the withholding process, and DOJ agreed to look into the issue.

67. On August 21, 2018, Mr. C.'s counsel was informed that he would receive his reasonable fear interview from USCIS on August 23. The same day, without notifying counsel, Respondent DHS transferred Mr. C. approximately two hours away to OCCF in upstate New York.

68. On August 23, USCIS conducted Mr. C.'s reasonable fear interview, and determined that Mr. C. has a reasonable fear of returning to Honduras. As a result of that finding, Mr. C is eligible to be released from detention pursuant to Section 1226(a) of Title 8. *Guerra v. Shanahan*, 831 F.3d 59, 64 (2d Cir. 2016) (finding 8 U.S.C. § 1226(a) to be the controlling statute regarding the detention or release of an individual who has passed his reasonable fear interview and is continuing to seek withholding of removal). Although he is not subject to "mandatory detention" pursuant to 8 U.S.C. §1226(c), Mr. C. has been provided no ability to seek release.

### D. Five Months After Their Initial Detention, Petitioners Are Referred To Immigration Court, But Have Since Been Provided With No Bond Hearing Or Ability to Seek Family Reunification

69. On August 23, 2018, upon informing Mr. C. and his counsel that USCIS found that Mr. C. has reasonable fear of returning to Honduras, DHS officials gave Mr. C. a Notice of

Referral to Immigration Judge (DHS Form I-863) stating that he would be heard in front of an Immigration Judge at 201 Varick Street, New York, New York 10014 on September 7, 2018.

70. Also on August 23, 2018, DOJ reiterated that "DHS is not contesting [Mr. C.'s] parentage/family status with respect to [D.J.C.V.]. As explained, [Mr. C.] cannot be housed him [sic] in an [sic] family residential center given the criminal conviction and, as such, he is not a Ms. L. class member. DHS will reunify for the purposes of removal."

71. Shortly before Mr. C.'s September 7, 2018 hearing before the Immigration Court, Mr. C.'s counsel contacted the Court, which said that there was no hearing docketed, and the USCIS Asylum Office likely had not forwarded Mr. C.'s case file. The notice to appear on September 7 thus appeared to be false, in keeping with an apparent pattern by DHS and its components to issue notices to appear with false or erroneous dates. *See* Patrick Young, *ICE Issuing Notice to Appear with Fake Dates*, Long Island WINS (Sept. 19, 2018), https://longislandwins.com/news/ice-issuing-notice-to-appear-for-court-with-fake-dates/.

72. On September 13, 2018, counsel for Mr. C. submitted to ICE a letter requesting Mr. C.'s release, and detailing the law establishing that he is eligible for release and facts showing that Mr. C. is neither a danger to the community nor a flight risk. Counsel has not received any response, and calls to ICE officials have gone unanswered.

73. Also on September 13, 2018, the American Civil Liberties Union ("ACLU") filed Plaintiffs' Brief Regarding Reunification of Two Parents arguing that Mr. C. should be included within the *Ms. L.* class in the action before the Southern District of California. The government argued that Mr. C. should not be included in the class due to his criminal history. The government further argued that "[a]ny parent separated from his or her child, but who is not a *Ms. L.* class member, may still be reunified with his or her child under existing processes, or if

not reunified would need to file an individual action seeking reunification under his or her particular circumstances." Supplemental Briefing, *Ms. L. v. U.S. Immigration and Customs Enf't, et al.*, No. 3:18-cv-00428 (S.D. Cal Sept. 13, 2018) (Dkt. No. 223). On September 19, the Honorable Dana Sabraw agreed with the government, and declined to agree with the ACLU that Mr. C. should be considered a *Ms. L.* class member. Mr. C. now bring his individual action as the government directed.

74. As of the date of this filing, Mr. C. has not been scheduled for a bond hearing in front of the Immigration Court. On October 1, 2018, Mr. C.'s counsel was told by the Immigration Court that Mr. C. is scheduled for a master calendar hearing in front of the Immigration Court on October 5, 2018 at 1:00 pm. While counsel intends to make an oral application for bond at that time, the Immigration Court is not required to hear arguments for bond and may set a date further in the future, or may not set a bond hearing at all.

75. Also as of the date of this filing, Mr. C. has not been permitted a single visitation or phone call with his son in five months.

76. Although ORR made efforts to find a "sponsor" to take custody of D.J.C.V. in the United States, there is no such person available to care for him and he remains in the custody of ORR to this date.

77. Without a bond hearing date in Immigration Court, or any other meaningful avenue to seek reunification or release, Petitioners ask this Court to exercise its broad habeas authority to right a prolonged and damaging wrong perpetrated by Respondents.

78. Consistent with a central aspect of the Trump Administration's Zero Tolerance policy, described in Section B *supra*, Petitioner Mr. C. was told he could be reunified but only if

he forfeited his pending application for withholding of removal, as well as his son's right to seek asylum.

**E. The Forced Separation of Father and Son Imposes Trauma and Severe Physical or Mental Pain or Suffering on Petitioners**

79. Respondents' violations continue to inflict real and irreparable harm upon both father and son, including severe mental pain or suffering. Separating a young child from a parent – particularly without any information about a parent's whereabouts or possibility of reunification – is a traumatic event in the life of a child that will likely have a devastating and lasting impact on D.J.C.V's psychological well-being. Children are likely to experience post-traumatic stress symptoms such as anxiety, terror, stress, and the damage can be permanent, especially where it occurs on top of trauma from the precarious journey to the United States. The American Academy of Pediatrics has explained the real life harm suffered when a child is ripped away from his parent: "[f]ear and stress, particularly prolonged exposure to serious stress without the buffering protection afforded by stable, responsible relationship . . . can harm the developing brain and harm short-and long-term health."[12] "[H]ighly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short-and long-term health. This type of prolonged exposure to serious stress – known as toxic stress – can carry lifelong consequences for children."[13] *See also* Miriam Jordan, *A Migrant Boy Rejoins His Mother, But He's Not the Same*, N.Y. Times (July 31, 2018), https://www.nytimes.com/2018/07/31/us/migrant-children-separation-anxiety.html

[12] Letter from Colleen A. Kraft, MD, FAAP, President of the American Academy of Pediatrics, to DHS Secretary Nielsen (Mar. 1, 2018), https://downloads.aap.org/DOFA/AAP%20Letter%20to%20DHS%20Secretary%2003-01-18.pdf.

[13] Colleen A. Kraft, *AAP Statement Opposing Separation of Children and Parents at the Border*, American Academy of Pediatrics (May 5, 2018), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposingSeparationofChildrenandParents.aspx.

(reporting that "Decades of research have concluded that children traumatically separated from their parents have a high likelihood of developing emotional problems, cognitive delays and long-term trauma," and that "More recent studies have found that separation can impair memory and normal production of cortisol, a hormone produced in response to stress.").

80. D.J.C.V., at the tender age of two, is likely to suffer from the effects of chronic and ongoing trauma, putting him at great risk of developing cognitive and emotional impairments that could have lifelong consequences.

81. Respondents are no doubt aware of the psychological and physiological trauma and suffering caused by separating a child from a parent – it is a self-evident reality of every day human life. Even more, Respondents were explicitly warned by government officials of the barbaric harms this policy would visit on children. Commander Jonathan White of the United States Public Health Service Commissioned Corps testified before the Senate Judiciary Committee on July 31, 2018 "that he had warned his superiors that separating children from their parents carries a 'significant risk of harm' and could inflict 'psychological injury.'"[14] On February 12, 2018, 33 United States Senators signed a letter to Secretary Nielsen to express their "deep concern" about DHS' considering a proposal of "systematically separat[ing[] immigrant children from their parents upon arrival in the United States", a "cruel" and "grotesquely inhumane" practice that they recognized would "inflict significant trauma on small children." *See* Letter to Secretary Nielsen (Feb. 12. 2008), https://aila.org/File/DownloadEmbeddedFile/74981.

---

[14] N. Miroff & K. Memirjian, *Senate Panel Skewers Trump Officials Over Migrant Family Separations*, Washington Post (July 31, 2018), https://www.washingtonpost.com/world/national-security/lawmakers-to-question-trumpofficials-on-migrant-family-separations-struggle-to-reunite-them/2018/07/31/ddb61390-9467-11e8-8ffb-5de6d5e49ada_story.html?utm_term=.27575f06d9ea

82. Indeed, the known cruelty associated with family separation is intentionally at the heart of Respondents' actions. They impose this cruelty to send a deterrent message to others and to coerce families to give up their rights to asylum. This intentional infliction of severe mental or physical pain or suffering constitutes torture under customary international law. Indeed, the Special Rapporteur on torture and other cruel, inhuman, or degrading treatment or punishment has observed that ill-treatment may amount to torture if it is intentionally imposed "for the purpose of deterring, intimidating or punishing migrants or their families [or] coercing them into withdrawing their requests for asylum."[15]

83. The guardian ad litem in this case wrote that "continued separation poses unacceptable risks to [D.J.C.V.'s] health and well-being. [D.J.C.V.'s] separation from his father for the last five months has been traumatic and has taken a significant toll on [D.J.C.V.'s] health. [D.J.C.V.] is very confused about why he is separated from his father, who he has had no contact with in months. He continues to struggle to make sense of life in an ORR shelter without either of his parents." She further stated that "[D.J.C.V.] needs his father's daily attention, care, and love. So long as this separation keeps [D.J.C.V.] from living and developing under his father's care, [D.J.C.V.'s] health, safety, and well-being will continue to suffer and will likely worsen."

84. Mr. C. is also suffering extreme anxiety, constantly worried about his son's well-being. He calls counsel at least twice per week, asking how D.J.C.V. is doing, and if there is any new information. In the last few weeks, Mr. C. has been experiencing increasingly severe stomach pains and, recently, chest pains due to the anxiety about when he will ever see his child

[15] U.N. Hum. Rts. Council, *Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, ¶ 20, U.N. Doc. A/HRC/37/50 (Feb. 26, 2018), https://www.ohchr.org/Documents/Issues/Torture/A_HRC_37_50_EN.pdf.

again. Mr. C. takes daily medication for depression since being detained, and often cries when he is alone in his cell, overwhelmed with concern for his son.

## LEGAL FRAMEWORK: HABEAS AUTHORITY

85. Because this action arises in the context of habeas corpus, this Court has plenary authority, both statutory and equitable, to remedy the Petitioners' continuing unlawful detention. The relief that Petitioners seek here is entirely consistent with the nature and history of the Great Writ, and its mandate to fashion appropriate relief based on the facts and circumstances of a particular case in order to correct errors of law and justice. *See* 28 U.S.C. § 2243 ("The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."); *Harris v. Nelson*, 394 U.S. 286, 292 (1969) ("The language of Congress, the history of the writ, the decisions of this Court, all make clear that the power of inquiry on federal habeas corpus is plenary.") (internal quotations and citations omitted).

86. This Court is specifically authorized to release Petitioners during the pendency of their petitions. *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001); *see also Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 153 (2d Cir. 2007) (explaining that the Real ID Act of 2005 "did not qualify our inherent authority to admit to bail petitioners in immigration cases.").

87. The law is equally clear that habeas courts have broad authority to enter any form of order, including declaratory or injunctive relief, where, as here, the requested relief directly compels or indirectly "affects" or hastens the petitioner's release from custody. *See Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973) (noting that habeas courts have the "power to fashion appropriate relief other than immediate release."); *Carafas v. LaVallee*, 391 U.S. 234, 239 (1968) (emphasizing that habeas statute "does not limit the relief that may be granted to discharge of the applicant from physical custody. Its mandate is broad with respect to the relief that may be granted.").

88. No exhaustion requirement applies here because no administrative agency exists to adjudicate Petitioners' constitutional challenges. *Howell v. INS*, 72 F.3d 288, 291 (2d Cir. 1995); *Arango-Aradondo v. INS*, 13 F.3d 610, 614 (2d Cir. 1994). Neither an immigration judge nor the Board of Immigration Appeals can rule on Petitioners' constitutional claims. *See Matter of C--*, 20 I&N Dec. 529, 532 (BIA 1992) ("it is settled that the immigration judge and this Board lack jurisdiction to rule upon the constitutionality of the Act and the regulations.") (*citing Bagues-Valles v. Immigration & Naturalization Serv.,* 779 F.2d 483, 484 (9th Cir. 1985) ("BIA…has no jurisdiction to adjudicate constitutional issues").

89. In addition, the exhaustion requirement may be excused where "a particular plaintiff may suffer irreparable harm if unable to secure immediate judicial consideration of his claim." *McMcCarthy v. Madigan*, 503 U.S. 140, 147 (1992). "[I]rreparable harm is presumed where there is an alleged deprivation of constitutional rights." *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). Petitioners suffer irreparable harm each day that passes separately from each other.

90. The detention and separation of Petitioners for five months with no plan of reunification other than deportation is a violation of numerous constitutional and statutory rights.

## CLAIMS FOR RELIEF

### Count I: Stay of Removal

91. All previous paragraphs are incorporated as though fully set forth herein.

92. Petitioners move for an order staying their removal from this District, or from the United States to Honduras pending the Court's resolution of their habeas and other claims. Petitioners have been subject to continuous pressure and coercion to abandon their claims for immigration protection in the United States in order to be released from detention and reunited, notwithstanding the death threats against them in Honduras. The government has repeatedly

threatened Petitioners with deportation and has pressured them to abandon their asylum claims in order to see each other again – a choice that would hardly be voluntary. In addition, government officials have repeatedly moved children from one jurisdiction or another. *See, e.g.* Caitlin Dickerson, *Migrant Children Moved Under Cover of Darkness to a Texas Tent City*, N.Y. Times (Sept. 30, 2018), https://www.nytimes.com/2018/09/30/us/migrant-children-tent-city-texas.html. The Court should therefore grant the motion in order to preserve its jurisdiction to fully and adequately adjudicate Petitioners' habeas rights.

93. This Court also has ample authority to issue interim relief in the nature of a stay order in several respects. First, the Court may enter an order pursuant to the All Writs Act, 28 U.S.C. § 1651, in order to preserve its jurisdiction to fully and adequately address Petitioners' habeas claims, including any claims to the Court's habeas jurisdiction. Second, as explained more fully in Petitioners' accompanying motion pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court may enter a temporary restraining order or preliminary injunction to stop the transfer pending a determination of its habeas jurisdiction. *See*, *e.g.*, *Belbacha v. Bush*, 520 F.3d 452, 455, 459 (D.C. Cir. 2008) (citing cases) (temporarily enjoining transfer to Algeria in aid of jurisdiction and remanding for preliminary injunction proceedings in detainee habeas case); *id.* at 460 (Randolph, J., dissenting) (proposing stay of transfer under All Writs Act). Indeed, if Respondents were to return Petitioners to Honduras prior to the Court's resolution of his habeas claims, that would effectively and impermissibly arrogate exercise of the Court's habeas power to the very detaining authority it was invoked in order to constrain.

**Count II: Violation of Substantive Due Process**
**Right to Family Integrity –**

94. All previous paragraphs are incorporated as though fully set forth herein.

95. The Due Process Clause of the Fifth Amendment applies to all "persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent" and thus applies to the Petitioners. *Zadvydas v. Davis*, 533 U.S. 678, 679 (2001). Here, Petitioners seek to vindicate both their substantive and procedural due process rights.

96. Petitioners D.J.C.V. and Mr. C. have a liberty interest under the Due Process Clause to be free from unlawful detention. Here, Petitioners' detention is unlawful in multiple respects.

97. Their detention violates their substantive due process right to remain together as a family and ensure their family integrity. Respondents' separation of Petitioners furthers no legitimate purpose, let alone any compelling governmental interest.

98. The liberty interest at stake here, the right of father and son to be together, "has long been recognized as a fundamental right." *W.S.R. v. Sessions*, 318 F. Supp. 3d 1116, 1124 (N.D. Ill. 2018); *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000) (citing nearly 80 years of precedent and describing parents' rights "in the care, custody, and control of their children" to be "perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Ms. L. v. U.S. Immigration and Customs Enf't* , 302 F. Supp. 3d 1149, 1161 (S.D. Cal. 2018) ("it has long been settled that the liberty interest identified in the Fifth Amendment provides a right to family integrity or to familial association…there is no dispute the constitutional right to family integrity applies to aliens…").

99. Because Mr. C. is in immigration custody, "the specific interest is a child's right to reunify with his parent in immigration custody…absent parental unfitness or danger to the child. That specifically and concretely described right is supported by the long line of cases…that established and continually reaffirm the fundamental right of a child to remain in the

custody of a fit parent." *W.S.R.*, 318 F. Supp. 3d at 1126 (holding that there is "no doubt" that by forcibly separating fathers from their sons and keeping them apart, the government substantially interfered in their fundamental rights, and that such separation can only be "deemed arbitrary and conscious shocking").

100. Respondents have clearly, and intentionally, interfered with that fundamental right for no legitimate, let alone compelling, reason.

101. There has been no allegation, and indeed no hearing or evidentiary showing, that Mr. C. is unfit to care for D.J.C.V. *Stanley v. Illinois*, 405 U.S. 645 (1972). In fact, the government's willingness to reunify Mr. C. and D.J.C.V. should they choose to abandon their claims to relief and protection under U.S. immigration law, speaks to its belief that Mr. C. is fit to care for D.J.C.V.

**Count III: Violation of Substantive Due Process Right to Be Free from Punitive and Purposeless Non Criminal Detention**

102. Petitioners have a substantive due process right not to be detained for an improper purpose, including for purposes of coercing them to abandon, or deterring others from attempting to exercise, their rights under U.S. and international law to seek asylum or other immigration protections. *See, e.g., R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 190 (D.D.C. 2015) (finding government's desire to deter migration a "poorly substantiated" justification for immigration detention).

**Count IV: Violation of Substantive Due Process Right to Be Free from Indefinite Detention Without Foreseeable End (*Zadvydas*)**

103. To the extent that Petitioners continue to be detained without foreseeable end during the pendency of this case, for a period of time that exceeds six months from the time of their initial detention on April 30, 2018, their detention violates substantive due process. *See*

*Zadvydas*, 533 U.S. at 680 & 689-90 (construing statute authorizing detention of admitted aliens to contain reasonable time limitation in order to avoid serious constitutional concerns raised by indefinite detention, and holding that after six months of detention and a petitioner's showing that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must provide evidence to the contrary); *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (construing statute to limit detention of aliens not formally admitted to the United States to avoid constitutional issues).

**Count V: Violation of Substantive Due Process Right to Be Free from Torture and/or Cruel, Injuman and Degrading Treatment**

104. All previous paragraphs are incorporated as though fully set forth herein.

105. Petitioners also have a substantive due process right to be free from torture and other cruel, inhuman and degrading treatment.

106. Substantive due process "prevents the government from engaging in conduct that 'shocks the conscience.'" *United States v. Salerno*, 481 U.S. 739, 746 (1987) (quoting *Rochin v. California,* 342 U.S. 165, 172 (1952)).[16] It also prevents government conduct that "interferes with rights 'implicit in the concept of ordered liberty.'" *Id.* (citing *Palko v. Connecticut,* 302 U.S. 319, 325-326 (1937)). In addition, the Court has specifically classified torture as conscience-shocking conduct enjoined by substantive due process. *See Palko*, 302 U.S. at 326 (noting that the Due Process Clause must at least "give protection against torture, physical or

[16] In *Salerno*, the Court held that the Bail Reform Act's authorization of pretrial detention based on future dangerousness does not violate substantive due process because pretrial detention is "carefully limit[ed]" to circumstances involving the "most serious of crimes"; arrestees are afforded a "prompt detention hearing"; and "maximum length of pretrial detention is limited by the stringent time limitations of the Speedy Trial Act." 481 U.S. at 747. By contrast, Petitioners in this case have been detained for over five months without a bond hearing or any finding of dangerousness.

mental"). *See also Whitley v. Albers*, 475 U.S. 312, 327 (1986) ("[C]onduct that shocks the conscience or afford[s] brutality the cloak of law . . . violates the [Due Process Clause].").

107. Substantive due process enjoins the use of brutality against detained people, such as those subject to immigration detention, who are not covered by the Eighth Amendment. *See, e.g.*, *Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir. 1973) (Friendly, J.) ("It would be absurd to hold that a pretrial detainee has less constitutional protection against acts of prison guards than one who has been convicted."); *Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989) (Posner, J.) ("[I]f ever there were a strong case for 'substantive due process,' it would be a case in which a person who had been arrested but not charged or convicted was brutalized while in custody.").

108. The acts committed by Respondents against Petitioners constitute torture. "[T]orture means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. § 2340(1). This includes "act[s] specifically intended to inflict severe physical or mental pain or suffering . . . for the purpose of . . . punishment, intimidation, coercion, or any reason based on discrimination of any kind." 18 U.S.C. § 2441(d)(1)(A) (War Crimes Act).[17] The term "severe mental pain or suffering" means "prolonged mental harm caused by or resulting from," among other things, "the intentional infliction or threatened infliction of severe physical pain or suffering," or "threatened" harm to the victims or third persons. 18 U.S.C. § 2340(2) (definitions applicable to 18 U.S.C. § 2340A (Anti-Torture Statute)); 18 U.S.C. § 2441(d)(2)(D) (incorporating definition from 18 U.S.C. § 2340(2)). *See also* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 1, ¶ 1, GA Res. 39/46, (Dec.

[17] Cruel, inhuman or degrading treatment includes the intentional infliction of "severe *or serious* physical or mental pain or suffering." 18 U.S.C. § 2441(d)(B) (emphasis added).

10 1984) (CAT), *reprinted in* 23 ILM 1027 (1984), *as modified,* 24 ILM 535 (1985) (defining torture as including causing "severe pain or suffering, whether physical or mental," without the requirement to show prolonged mental harm.

109. The harm that Petitioners have suffered is permanent, or likely will become permanent absent immediate judicial relief.

**Count VI: Violation of Procedural Due Process Right to Seek Asylum, Withholding of Removal, Protection under the Convention Against Torture, and/or Other Immigration Relief**

110. All previous paragraphs are incorporated as though fully set forth herein.

111. Petitioners have a procedural due process right to seek relief under U.S. immigration statutes and international law, including asylum, withholding of removal, or protection from torture under CAT. Petitioners are entitled to the opportunity to seek those protections without the government violating their fundamental right to family unity. Creating an ultimatum permitting Petitioners to reunify only if they choose to relinquish those rights to which they are entitled undermines the entire purpose of the protections afforded under the asylum statutes and CAT, and violates their Fifth Amendment due process right to petition the U.S. government for protection, and a statutory procedural due process right to a meaningful or fair evidentiary hearing. *Gutierrez-Rogue v. INS*, 954 F.2d 769, 772-73 (D.C. Cir. 1992) (citing *Maldonado-Perez v. INS*, 865 F.2d 328, 332-33 (D.C. Cir. 1989)). In addition, both father and son have been detained for over five months, and have not been afforded any access to a bond hearing or other ability to seek release. USCIS has determined that Mr. C. has a reasonable fear of returning to Honduras. As a result of that finding, Mr. C is eligible to be released from detention pursuant to Section 1226(a) of Title 8. *Guerra*, 831 F.3d at 64 (finding 8 U.S.C. § 1226(a) to be the controlling statute regarding the detention or release of an individual who has passed his reasonable fear interview and is continuing to seek withholding of removal).

Although he is not subject to "mandatory detention" pursuant to 8 U.S.C. §1226(c), Mr. C. has been provided no ability to seek release. As discussed in Paragraph 74, there is no guarantee that the master calendar date will provide the opportunity for a bond hearing.

**Count VII: Violation of Asylum Statute**

112. All previous paragraphs are incorporated as though fully set forth herein.

113. Under United States law, noncitizens with a well-founded fear of persecution shall have the opportunity to seek and obtain asylum in the United States. 8 U.S.C. § 1158. Noncitizens are entitled to a mandatory withholding of removal where they would face the probability persecution or torture if removed. 8 U.S.C. § 1231(b)(3)).

114. Respondents' separation of Mr. C. from his son and their proposal of deportation as the only means of reunification violates federal asylum law because it impedes their ability to pursue their asylum claims as is their right.

**Count VIII: Violation of Equal Protection Clause**

115. All previous paragraphs are incorporated as though fully set forth herein.

116. The Equal Protection Clause of the Fifth Amendment protects all "persons," within the United States from "invidious discrimination by the Federal Government." *Plyler v. Doe*, 457 U.S. 202, 210 (1982), citing *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). It is well-established that the Fifth Amendment's protections extend to "aliens, even aliens whose presence in the United States is unlawful." The Equal Protection Clause thus applies to Petitioners.

117. The Fifth Amendment contains an implicit guarantee of equal protection that invalidates any official action that in part reflects a racially discriminatory intent or purpose. Classifications based on race or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race or national origin.

118. Respondents' decisions to create and implement a policy of forcible separation of families at the border between the United States and Mexico was motivated in part by racial animus and national origin discrimination, and the government has articulated no compelling reason to detain and separate families on account of their race and national origin. The continued detention and forcible separation of Mr. C. and D.J.C.V. following their flight from Honduras and their stated decision to seek asylum is a direct outcome of the family separation policy, and Petitioners have thus been denied their right to equal protection under the law.

119. As a result of these decisions, Mr. C. and D.J.C.V. have been and are being denied their right to equal protection under the law.

**Count IX: Administrative Procedure Act**
**Arbitrary and Capricious Practice**

120. All previous paragraphs are incorporated as though fully set forth herein.

121. Respondents' assertion that deportation is the only option to reunify father and son because it does not possess the facilities capable of detaining them together due to Mr. C's eight-year old misdemeanor conviction without any showing of danger, is arbitrary, capricious, and an abuse of discretion. Administrative Procedure Act, 5 U.S.C. § 706 ("APA").

122. Respondents' refusal to facilitate any visitation or communication between Mr. C. and D.J.C.V. also violates the APA. *Id.* The APA provides that courts "shall…hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

**Count X: Violation of the Flores Settlement Agreement**

123. All previous paragraphs are incorporated as though fully set forth herein.

124. Respondents' forcible separation of Petitioners without reason violates the Flores Settlement Agreement ("FSA"), which requires the federal government to place children in custody in the least restrictive setting that is in the best interests of the child, and to release children to their parent in the first instance, without regard to the parents' immigration status and above all other forms of release. FSA ¶¶ 11, 14, and 24.

125. D.J.C.V. challenges Respondents' placement decision pursuant to Paragraph 24B of the FSA, arising from longstanding litigation in the matter of *Flores v. Sessions*, CV-85-4544 (C.D. Cal.).

126. The FSA gives D.J.C.V. the right to challenge the improper decision by Respondents to place him in the custody of ORR apart from his father. Paragraph 24(B) of the FSA "acts as a choice-of-forum clause, allowing District Courts around the Nation to consider individual challenges." *W.S.R.*, 318 F. Supp. 3d at 1129.

127. The release of a minor to his or her parent is the primary objective of the FSA (FSA ¶ 14), and Respondents must work to release a minor at all times: "Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay in the following order of preference, to:

a. ***a parent***[18] (emphasis added);
b. a legal guardian;
c. an adult relative (brother, sister, aunt, uncle, or grandparent);
d. an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under

[18] 8 C.F.R. § 1236.3(b)(iii) goes even further and spells out that if a juvenile and a parent are each in detention which is deemed mandatory, nonetheless they may be considered for release on a case-by-case basis. This Court retains authority to review placement as laid out in the instant complaint.

penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

e. a licensed program willing to accept legal custody; or

f. an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility."

*See id.* ¶ 14.

128. Per the FSA, the parties agreed "that the [government] must assure itself that someone will care for those minors pending resolution of their deportation proceedings. That is easily done when the juvenile's parents have also been detained and the family can be released together…"

129. Respondents have taken no meaningful steps, and certainly no expeditious steps, to process and release D.J.C.V. from their custody as D.J.C.V. has remained in ORR's custody for five months. The continued separation entirely fails to ensure D.J.C.V.'s safety, but rather ensures continued and irreparable harm to a young child torn from him family and placed in the care of strangers.

130. D.J.C.V.'s legal interests are also undermined as his case is best served in the custody of the accompanying parent navigating a similar asylum/CAT process based upon similar facts.

131. Respondents' failure to provide *any* contact between father and son also violates of the FSA, which requires that "[w]henever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with… contact with family members who were arrested with the minor." FSA ¶ 14. D.J.C.V. has not been provided *any*, let alone sufficient, contact or communication with his father.

**Count XII: Equitable Habeas Relief**

132. All previous paragraphs are incorporated as though fully set forth herein.

133. The Court has equitable, common law habeas authority to dispose of Petitioners' case as law and justice require, based on the unique facts and circumstances of Petitioners' case, in order to remedy Petitioners' unlawful detention.

134. The Court should exercise this authority to grant Petitioners' habeas corpus petition and to fashion any and all additional relief, including interim and declaratory relief, necessary to effectuate Petitioners' expeditious release from unlawful detention and reunification.

**Request for Relief**

**WHEREFORE**, Petitioners request that the Court grant the following relief:

A. Issue a Writ of Habeas Corpus and/or Temporary Restraining Order or Preliminary Injunction ordering Petitioners' immediate release from detention pending final resolution of their asylum, withholding, or CAT applications or other immigration proceedings, and exhaustion of all administrative and judicial appeals;

B. Declare the separation of D.J.C.V. from his father, Mr. C., as unlawful;

C. Order frequent and ongoing visitation and contact between Petitioners until both are physically released and reunified;

D. Enjoin Respondents from moving Mr. C. or D.J.C.V. from the Southern District of New York pending the resolution of these proceedings and the final resolution of their asylum, withholding, or CAT applications or other immigration proceedings, and exhaustion of all administrative and judicial appeals;

E. Enjoin Respondents from transferring the immigration cases for Mr. C. or D.J.C.V. to Immigration Courts outside of the Southern District of New York pending the resolution of these proceedings and the final resolution of their asylum, withholding, or CAT

applications or other immigration proceedings, and exhaustion of all administrative and judicial appeals;

F. Preliminarily and permanently enjoin Respondents from continuing to separate D.J.C.V. from Mr. C.;

G. Preliminarily and permanently enjoin Respondents from removing either Mr. C. or D.J.C.V. from the United States until they are reunited and each have had a full and fair opportunity to pursue their asylum, withholding, or CAT applications or other immigration proceedings, and exhaustion of all administrative and judicial appeals;

H. Award Petitioners reasonable attorney's fees and costs pursuant to 28 U.S.C. § 2412; and

I. Fashion such additional relief as is necessary and appropriate, including declaratory relief or other interim relief necessary to vindicate Petitioners' rights under U.S. and international law.

J. Award all other relief to Petitioners that it deems just, equitable, and proper.

Dated: New York, New York
October 4, 2018

MORGAN, LEWIS & BOCKIUS LLP

By: /s/

CAROLYN SILANE
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0600
Tel: 212.309.6000
Fax: 212.309.6001
carolyn.silane@morganlewis.com

- and -

CENTER FOR CONSTITUTIONAL RIGHTS

By: /s/
Baher Azmy, BAzmy@ccrjustice.org
J. Wells Dixon, WDixon@ccrjustice.org
Shayana D. Kadidal, shanek@ccrjustice.org
Ghita Schwarz, gschwarz@ccrjustice.org
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
212.614.6464

*Attorneys for Petitioners Mr. C. and D.J.C.V.*