**UNITED STATES COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| D.J.C.V, a minor, and Mr. C. | |
| *Petitioners,* | **Case No.** |
| v. | **Hon.** |
| U.S. Immigration and Customs Enforcement ("ICE"), et al. | |
| *Respondents.* | |

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION FOR**
**PRELIMINARY INJUNCTION ON EXPEDITED SCHEDULE**

# TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ....................................................................................2

I.     Petitioners' Flight From Danger in Honduras And Detention In The United States ........2

II.    Respondents' "Zero Tolerance" Policy ..........................................................5

ARGUMENT .......................................................................................................7

PETITIONERS ARE ENTITLED TO A PRELIMINARY INJUNCTION .................................7

I.     THE APPLICABLE STANDARD ................................................................7

II.    PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS................................8

    A.     Petitioners Are Likely to Succeed on the Merits of Their Claim for Habeas Relief ........8

    B.     Petitioners Are Likely To Succeed on Their Substantive and Procedural Due Process Claims ........11

        1.     Petitioners' Ongoing Separation Violates their Substantive Due Process Right to Family Integrity ........12

        2.     Petitioners' Detention and Separation Violates Their Substantive Due Process Right to be Free from Torture........13

        3.     Petitioners Detention and Separation Violates Their Substantive Due Process Right to be Free from Purposeless or Punitive Non-Criminal Detention ........17

        4.     Petitioners' Forced Separation Without Notice or Opportunity to be Heard, Violates Their Right to Procedural Due Process ........19

    C.     Respondents' Detention of a Young Child Away From His Father For Five Months Violates the Flores Settlement ........20

        1.     Respondents Failed to Detain D.J.C.V. In The Least Restrictive Setting As Required Pursuant To Paragraph 11 of the FSA Protections ........20

        2.     There is a Preference, Which Respondents Ignore, to Release Minor from Custody to a Parent ........21

        3.     Respondents' Indefinite Detention of D.J.V.C. Apart From His Parent With No Visitations or Telephone Calls Violates Paragraph 12 Protections ........22

III.   PETITIONERS WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS NOT GRANTED........23

IV.    THE BALANCE OF EQUITIES FAVORS GRANTING THE PRELIMINARY INJUNCTION ........25

V.     THE PUBLIC INTEREST FAVORS GRANTING THE PRELIMINARY INJUNCTION ........26

CONCLUSION ........26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Belbacha v. Bush*,
    520 F.3d 452 (D.C. Cir. 2008)................................................................11

*Boumediene v. Bush*,
    553 U.S. 723 (2008) ...............................................................9, 10, 11

*Carafas v. LaVallee*,
    391 U.S. 234 (1968) .........................................................................10

*Chhoeun v. Marin*,
    306 F. Supp. 3d 1147, 1162 (C.D. Cal. 2018)....................................24

*Flores v. Reno*,
    No. CV 85-4544-RJK(Px) .............................................................1, 8

*Flores v. Sessions*,
    CV-85-4544 (C.D. Cal.) ...................................................................20

*Foucha v. Louisiana*,
    504 U.S. 71 (1992) ...........................................................................10

*Guerra v. Shanahan*,
    831 F.3d 59 (2d Cir. 2016) .....................................................3, 10, 25

*Harris v. Nelson*,
    394 U.S. 286 (1969) .....................................................................9, 10

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ........................................................23, 26

*In the Matter of D.A.M.*,
    (January 30, 2015) ...........................................................................18

*Innovation Law Lab v. Nielsen*,
    310 F. Supp. 3d 1150 (D. Or. 2018)..............................................25, 26

*INS v. St. Cyr*,
    533 U.S. 289 (2001) ...........................................................................9

*J.S.R. v. Sessions*,
    No. 3:18-cv-1106, 2018 U.S. Dist. LEXIS 116653 (D. Conn. July 13, 2018)................19, 23

*Jackson v. Indiana,*
    406 U.S. 715 (1972) ............................................................................................... 17

*Johnson v. Glick,*
    481 F.2d 1028 (2d Cir. 1973) ............................................................................... 14

*Jolly v. Coughlin,*
    76 F.3d 468 (2d Cir. 1996) ..................................................................................... 7

*Kansas v. Hendricks,*
    521 U.S. 346 (1997) ............................................................................................... 9

*Kirwa v. U.S. Dep't of Def.,*
    285 F. Supp. 3d 21 (D.D.C. 2017) ........................................................................ 24

*Leiva–Perez v. Holder,*
    640 F.3d 962 (9th Cir. 2011) ................................................................................ 24

*Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.,*
    965 F.2d 1224 (2d Cir. 1992) ................................................................................. 7

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ............................................................................................. 19

*Mills v. D.C.,*
    571 F.3d 1304 (D.C. Cir. 2009) ........................................................................... 23

*Ms. L. v. U.S. Immigration and Customs Enf't,*
    302 F. Supp. 3d 1149 (S.D. Cal. 2018) ................................................... 12, 23, 26

*Ms. L. v. U.S. Immigration and Customs Enf't,*
    No. 3:18-cv-00428 (S.D. Cal Sept. 13, 2018) ..................................................... 12

*Palko v. Connecticut,*
    302 U.S. 319 (1937) ............................................................................................. 13

*Preiser v. Rodriguez,*
    411 U.S. 475 (1973) ............................................................................................. 10

*R.I.L-R v. Johnson,*
    80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................................ 18

*Reno v. Flores,*
    507 U.S. 292 (1993) ............................................................................................. 20

*Salerno v. United States,*
    481 U.S. 739 (1987) ................................................................................... 8, 10, 13

*Schneiderman v. United States*,
    320 U.S. 118 (1943) ..................................................................... 9

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) ............................................................... 24

*Southerland v. City of New York*,
    680 F.3d 127 (2d Cir. 2012) ...................................................... 19

*Stanley v. Illinois*,
    405 U.S. 645 (1972) ................................................................... 13

*Troxel v. Granville*,
    530 U.S. 57 (2000) ..................................................................... 12

*W.S.R. v. Sessions*,
    318 F. Supp. 3d 1116 (N.D. Ill. 2018) ............................ 12, 13, 23, 26

*Walker v. Johnston*,
    312 U.S. 275 (1941) ................................................................... 10

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) .................................................. 24

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) .................................................. 23

*Whitley v. Albers*,
    475 U.S. 312 (1986) ................................................................... 14

*Wilkins v. May*,
    872 F.2d 190 (7th Cir. 1989) .................................................... 14

*Winter v. Natural Res. Def. Counsel*,
    555 U.S. 7 (2008) ......................................................................... 7

*Woodby v. INS*,
    385 U.S. 276 (1966) ..................................................................... 9

*Xuncax v. Gramajo*,
    886 F. Supp. 162 (D. Mass 1995) ............................................ 15

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ........................................................... *passim*

## Statutes

8 U.S.C. 1325(a) ................................................................................... 5

iv

8 U.S.C. § 1226(a) .................................................................................................3, 10, 11, 25

8 U.S.C. §1226(c) ...........................................................................................................10

18 U.S.C. § 2340 ............................................................................................................14

18 U.S.C. § 2441 ......................................................................................................14, 17

28 U.S.C. § 1651 ............................................................................................................11

28 U.S.C. § 2241(c)(3) .....................................................................................................8

28 U.S.C. § 2243 .........................................................................................................8, 9

28 U.S.C. § 2246 ..............................................................................................................9

Flores Settlement Agreement ...........................................................................20, 21, 22

LA Rev Stat § 14:36 .........................................................................................................4

LA Rev Stat § 14:37 .........................................................................................................4

8 C.F.R. § 1236.3(b)(iii) .................................................................................................21

Petitioners submit this Memorandum of Law in support of their Motion for Preliminary Injunction on Expedited Schedule and for a writ of habeas corpus. Petitioners, father and his now two-year old son, fled Honduras to the United States seeking an escape from the real and imminent probability of torture at the hands of violent gangs that made explicit threats against them both. Instead, Petitioners have faced a different brand of torture at the hands of the United States government forcibly separating them and holding them in detention indefinitely and, pursuant to the Trump Administration's cruel "Zero Tolerance" policy, with no prospect of release or reunification unless Petitioners agree to the coercive condition of forfeiting their asylum rights. The detention and forced family separation is without lawful authority and in violation of the Due Process Clause of the Fifth Amendment, and the special protections afforded to minors in the custody of United States immigration authorities pursuant to the settlement in *Flores v. Reno*, No. CV 85-4544-RJK(Px), Settlement Agreement (C.D. Cal. Jan. 28, 1997) (the "Flores Settlement Agreement" or "FSA").

Indeed, this detained father and his separately detained son, have not seen each other in over *five months* – nearly one quarter of the child's life. Beyond the immediate agony such forced separation would have on both parties – rising the level of "severe mental pain or suffering" that meets the statutory and international law definitions of torture – this cruelty risks long-term physiological and psychological harm to the child and long-term alienation of a child who may no longer even recognize his father. Petitioners come to this Court to seek an end to the harm being inflicted on them in violation of their most fundamental rights.

Petitioners have a substantial likelihood of prevailing on the merits of their case: First, because the government has no affirmative, lawful authority to detain Petitioners, the Court has plenary authority under the habeas corpus statute and its broad equitable authority to order

Petitioners released from detention and/or reunited, as well as other relief.  Second, the substantive due process limitations on detention forbid: (a) a violation of the right to family integrity absent a compelling justification; (b) the infliction of such severe mental pain or suffering on Petitioners, which constitutes torture and thereby "shocks the conscience"; (c) continuing noncriminal detention for a purposeless or punitive reason, such as is the case here, where the government's clear purpose is to deter future refugees from entering the United States and to coerce Petitioners to forfeit their rights to asylum or other immigration relief.  Third, the detention of Petitioners violates their procedural due process right to notice and opportunity to contest their detention.  Fourth, Respondents are also in clear violation of the Flores Settlement Agreement because they have not placed D.J.C.V. in the "least restrictive setting," have not sought to release D.J.C.V. to his father's custody, and have not permitted a single visit or contact between father and son in five months.  Petitioners also meet the remaining requirements for a preliminary injunction.  Any purported harm that the government may seek to claim is far outweighed by the ongoing, severe, and likely permanent harm to a two-year old boy and his father.

## **FACTUAL BACKGROUND**

## I.   **PETITIONERS' FLIGHT FROM DANGER IN HONDURAS AND DETENTION IN THE UNITED STATES**

On April 30, 2018, Mr. C. and infant son, D.J.C.V., arrived at a port of entry in the United States.  They had fled Honduras to escape threats of imminent death from members of gangs that had kidnapped and held Mr. C. at gun point, threatening his life and the life of his baby, and threats from other gang members that had already killed multiple members of Mr. C.'s extended family.  Immediately upon encountering United States border officials, Mr. C. communicated his fear of returning to Honduras.

Only days later, on or about May 2, 2018, Mr. C. and his young son were forcibly separated by Respondents.  Mr. C. has not been allowed to see or to speak to his son since that day.  For over five months now, a baby remains alone and frightened in the custody of the Office of Refugee Resettlement ("ORR"), while his father has been shuttled through detention facilities throughout the country, terrified about his son's wellbeing.  While ORR and the child's federally appointed guardian *ad litem* agree that Mr. C. and D.J.C.V. should be able to see and communicate with each other, and have sought to facilitate visitation between the two, Respondents have refused to permit *any* visitation or contact between Mr. C. and D.J.C.V.

On August 23, 2018, a USCIS Asylum Officer interviewed Mr. C. and found that he has a "reasonable fear" of returning to Honduras.  As a result, Mr. C. is eligible for discretionary release under the Immigration and Naturalization Act ("INA") while his immigration case is adjudicated.  *Guerra v. Shanahan*, 831 F.3d 59, 64 (2d Cir. 2016) (finding 8 U.S.C. § 1226(a) to be the controlling statute regarding the detention or release of an individual who has passed his reasonable fear interview and is continuing to seek withholding of removal).  The same day, he was provided with a Notice of Referral to Immigration Judge (DHS Form I-863) stating that he would be heard in front of an Immigration Judge at 201 Varick Street, New York, New York 10014 on September 7, 2018.  Shortly before that scheduled time, counsel for Mr. C. contacted the Immigration Court.  Counsel was told that there was no hearing scheduled, and the Asylum Office likely had not forwarded Mr. C.'s case file.  As of the date of this filing, no bond hearing has been scheduled and Mr. C. has been provided with no ability to seek release.

To justify continuing to separate father and son, Respondents have not alleged and certainly have not presented any evidence to show that Mr. C. is an unfit parent or a danger to his child in any way, nor could it.  In fact, a guardian *ad litem*, federally appointed to represent

D.J.C.V.'s interests, has investigated the case and has not only found that Mr. C. presents no danger to D.J.C.V., but that the young child is severely harmed each day he is not reunited with his father.  Yet, for over four months, the Respondents have refused to reunite the father and son, along the way changing their positions as to the basis for their decision.

At one point during his detention, Mr. C. was told by immigration officials that he would be reunited with his son, and was being transferred to the Hudson County Correctional Center ("HCCC") to facilitate that.  Mr. C.'s counsel was told the same by Mr. C.'s assigned Deportation Officer ("DO"), who also said that Mr. C. would likely be released once reunification was sorted out.  Thrilled he would get to see his son again, Mr. C. was again devastated when government agencies then questioned whether Mr. C. was D.J.C.V.'s true parent, despite legal documentation proving that he was, and refused to reunited him with his son.  Respondents then began the process of transferring Mr. C. further away from his son, back to Texas.  After being presented with additional evidence of parentage, first ORR and, only after involvement of Department of Justice ("DOJ") attorneys, the Department of Homeland Security ("DHS") finally acknowledged that Mr. C. is in fact D.J.C.V.'s father.  Undeterred, Respondents then created a new argument for continuing to detain father and son separately: Mr. C.'s eight year old misdemeanor conviction.[1]  Respondents claim that, as a result, Mr. C. cannot be housed in a family detention center.

Without access to a hearing or any sort of adjudication as to their ability to be released from detention, Respondents have instead given Petitioner Mr. C. an ultimatum.  He must choose

---

[1] On October 28, 2010, Mr. C. pled guilty to misdemeanor aggravated assault in Louisiana.  LA Rev Stat § 14:37. The incident did not involve any physical contact or harm to another; under Louisiana law, assault is defined as "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery."  LA Rev Stat § 14:36. The maximum penalty for the misdemeanor of which Mr. C was convicted under Louisiana law is a fine of up to $1,000, a term of imprisonment not more than six months, or both.  LA Rev Stat § 14:37.

to give up all of his and his son's rights to seek asylum, withholding, or protections under the

Convention Against Torture ("CAT") and return to a country where he has, according to an

Asylum Officer employed by Respondents, a reasonable fear of torture, in order to be reunited

with his son; or he can choose to pursue their rights, but remain separated and detained

indefinitely pending those proceedings.  Both avenues present gross violations of Petitioners'

constitutional rights and the continued detention and separation of a child and father is causing

them irreparable harm.

## II.    RESPONDENTS' "ZERO TOLERANCE" POLICY

As described more fully in the Petition for Writ of Habeas Corpus and Other Declaratory

and Injunctive Relief (the "Petition"), filed concurrently with this Motion, Respondents

implemented a "Zero Tolerance" policy specifically aimed at deterring future immigrants from

seeking asylum or similar protections in the United States.  Mr. C.'s detention and forced

separation from his child and the conditioning of his family reunification upon accepting

removal to Honduras where he fears persecution and death, appears to be a part of this deterrence

policy.

In March 2017, then-DHS Secretary John Kelly stated that he was considering separating

arriving children from their parents "in order to deter more movement" into the United States. [2]

On April 6, 2018, Respondent Sessions released a memorandum to "Federal prosecutors along

the Southwest border" entitled "Zero Tolerance for Offenses Under 8 U.S.C. 1325(a) [illegal

---

[2]  See John Haltiwanger, John Kelly Proposed Separating Children from Their Parents to Deter
Illegal Immigration Last Year, and Now the Trump Administration Can't Get Its Story Straight,
Business Insider, June 20, 2018; Jonathan Blitzer, How the Trump Administration Got
Comfortable Separating Immigrant Kids from Their Parents, The New Yorker, May 30, 2018.

entry]."[3]  J. Sessions, *Memorandum for Federal Prosecutors Along the Southwest Boarder*,

Office of the Attorney General (April 6, 2018), https://www.justice.gov/opa/press-

release/file/1049751/download.  On April 23, 2018, Secretary Nielsen signed off on a policy to

separate families in conjunction with the "Zero Tolerance" prosecution policy, with the explicit

goal of having an impact on "current flows," that is, deterring migration.  See Cora Currier,

*Prosecuting Parents – And Separating Families – Was Meant to Deter Migration, Signed Memo*

*Confirms*, The Intercept (Sept. 25, 2018), https://theintercept.com/2018/09/25/family-separation-

border-crossings-zero-tolerance/.  Shortly thereafter, the government began the widespread

implementation of a program to separate parents from children at the U.S.-Mexico border.

Office of the Inspector General, *Special Review – Initial Observations Regarding Family*

*Separation Issues Under the Zero Tolerance Policy*, OIG 18-84, 3-4 (Sept. 27, 2018),

https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf (hereinafter

"OIG Report").  Prior to the implementation of this new policy, "in most instances, family units

either remained together in family detention centers operated by ICE while their civil

immigration cases were pending, or they were released into the United States with an order to

appear in immigration court at a later date."  OIG Report at 2.

Respondents' policy also sought to deter families from asserting lawful rights to

immigration relief once they were in the United States by conditioning reunification with their

children upon a decision to return to their country of origin.  *See* Pet.¶ 37.  Written policies

implementing the Executive Order reveal that reunification of families would only occur only at

the point of removal.  *See Fact Sheet: Zero Tolerance Prosecution and Family Reunification*,

---

[3] Even though Petitioner Mr. C. was not prosecuted for a violation of Section 1325(a), his child
was still taken from him under other pretextual and unsupported reasons, pursuant to the Trump
Administration's broader goal of punishing families entering the United States in order to deter
future migration here.

Dep't Homeland Sec. (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification (stating that families will be reunified with children "for purposes of removal.")

## ARGUMENT

## PETITIONERS ARE ENTITLED TO A PRELIMINARY INJUNCTION

Petitioners are entitled to preliminary injunctive relief ordering: (1) Respondents to immediate release and reunite the Petitioners pending these proceedings and final resolution of their immigration proceedings; (2) preventing Respondents from moving Petitioners, or their immigration cases, from the Southern District of New York pending the resolution of these proceedings and final resolution of their immigration proceedings; (3) and preventing Respondents from removing Petitioners from the United States before final resolution of their immigration proceedings; and (4) frequent and ongoing visitation and contact between Petitioners until they are both physically released and reunified.

## I.    THE APPLICABLE STANDARD

Federal Rule of Civil Procedure Rule 65 authorizes a court to issue a preliminary injunction where the plaintiff establishes that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Counsel*, 555 U.S. 7, 20 (2008); *see also Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) ("In most cases, a party seeking to obtain a preliminary injunction must establish that it will suffer irreparable harm in the absence of an injunction and demonstrate either (1) 'a likelihood of success on the merits' or (2) 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly' in the movant's favor.") (quoting *Waldman Publ'g Corp. v. Landoll, Inc*., 43 F.3d 775, 779–80 (2d Cir. 1994)).

## II.    PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS

This Court should grant Petitioners' request for a preliminary injunction because they are likely to succeed on the merits of their claims under the Court's statutory and equitable powers to grant writs of habeas corpus and also under Fifth Amendment of the Constitution and the enforceable terms of the *Flores* Settlement Agreement.

### A.    Petitioners Are Likely to Succeed on the Merits of Their Claim for Habeas Relief

Petitioner D.J.C.V., a two-year old child, and his father, Petitioner Mr. C., have filed this habeas case to remedy the grave injustice of their months-long detention and separation from one another—without charge, without a bond hearing or other opportunity to seek release through the immigration system, and without foreseeable end—and to vindicate their rights under U.S. and international law.  As set forth below and in the Petition, Petitioners' detention violates their due process rights to be free from detention for the unlawful purpose of punishment, coercion and deterrence, and from torture.  Equally fundamentally, however, because the government lacks any positive law authority – in the Constitution, statute or regulation – that could justify Petitioners' continuing detention, this Court is independently authorized to order release and/or reunification pursuant to this Court's statutory and equitable habeas authority.  *See* 28 U.S.C. § 2241(c)(3).  The Court's broad equitable powers in these circumstances likewise authorize the requested interim relief of a stay of removal to Honduras or any district outside the Southern District of New York.

In the United States, "liberty is the norm and detention prior to trial or without trial is the carefully limited exception."  *Salerno v. United States*, 481 U.S. 739, 755 (1987).  Habeas corpus is designed to remediate violations of this foundational presumption by obligating the government to come forward and affirmatively "certify the true cause of detention."  28 U.S.C. §

2243, ¶3.  *See also id.*  ¶1 (court entertaining a habeas petition "shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted").  At "its historical core," habeas serves as a means of "reviewing the legality of Executive detention," as is at stake in this case, "and it is in that context that its protections have been strongest."  *INS v. St. Cyr*, 533 U.S. 289, 301 (2001).  *See also Boumediene v. Bush*, 553 U.S. 723, 783 (2008) (stressing that, unlike judicial review of prior criminal convictions, habeas review of executive or administrative detention in the first instance makes "the need for habeas corpus is more urgent").

The federal habeas statute sets forth procedures to evaluate a petition, including the requirement that the government is presumptively required to show cause for the detention within three days.[4]  Overall, however, in assessing the legality of the government's proffered justification for detention, a federal habeas court has plenary power to evaluate the petition and courts must fill in the "necessary facilities and procedures for an adequate inquiry."  *Harris v. Nelson*, 394 U.S. 286, 292-93, 300 (1969).

In order to justify this executive detention, the government must come forward with cognizable legal authority to imprison Petitioners, which would have to be supported factually by clear and convincing evidence.[5]  If the government fails to meet this burden the court is fully

---

[4] The habeas statute sets forth the relevant procedures. *See* 28 U.S.C. § 2243 (requiring the government to provide a "return" to the writ, i.e. the legal justification for the detention "within three days unless for good cause additional time, not exceeding twenty days.")  The petitioner may file a traverse of the return, and the Court "shall summarily hear and determine the facts, and dispose of the matter as law and justice require."  *Id.*  These procedures can include discovery, 28 U.S.C. § 2246, and a factual hearing, if necessary, to evaluate relevant, contested factual disputes going to the legality of a petitioner's detention. *Boumediene*, 533 U.S. at 786 (habeas courts have "some authority to assess the sufficiency of the Government's evidence against the detainee" and have "authority to admit and consider relevant exculpatory evidence").

[5] The Supreme Court has repeatedly held that, where the government seeks to impose similarly substantial deprivations of liberty, the government must justify the sufficiency of its case by clear and convincing evidence.  *See Woodby v. INS*, 385 U.S. 276, 286 (1966) (deportation); *Schneiderman v. United States*, 320 U.S. 118, 178 (1943) (denaturalization); *Kansas v.*

empowered to issue an order of release. *Boumediene*, 533 U.S. at 779; *Walker v. Johnston*, 312 U.S. 275, 284 (1941) ("discharge of petitioner is authorized where, "on the facts admitted, it may appear that, as a matter of law, the prisoner is entitled to the writ.").[6]

In this case, the government has already shown it is unlikely to be able to identify a lawful basis of detention. As detailed in the Petition, *see* Pet. ¶¶ 51 - 68, Respondents thus far have offered only a series of evasive, ever-changing rationales for why they have continued to detain a two-year old child and his father, separately, for five months without a hearing or other opportunity to seek relief. They have repeatedly asserted that Petitioner, Mr. C., is not the lawful father of Petitioner D.J.C.V. which is – and always has been – demonstrably false. Subsequently, they claimed they could detain Mr. C. because of his criminal history, even though his solitary, eight year old misdemeanor crime for which he served only 48 days is not subject to congressionally mandated detention pursuant to 8 U.S.C. §1226(c). Indeed, as a result of USCIS finding that Mr. C. has a well-founded fear of persecution in Honduras, Pet. ¶ 68, he is eligible to be released from detention pursuant to Section 1226(a) of Title 8. *Guerra*, 831 F.3d at 64

---

*Hendricks*, 521 U.S. 346, 353 (1997) (indefinite civil commitment of sex offender); *Foucha v. Louisiana*, 504 U.S. 71, 81 (1992) (continued commitment of criminal defendant found not guilty by reason of insanity); *Salerno*, 481 U.S. at 750 (pre-trial detention based on dangerousness).

[6] The nature of relief that Petitioners seek in this case – release and reunification is entirely also consistent with the equitable nature and history of the Great Writ, and its mandate to fashion appropriate relief based on the facts and circumstances of a particular case in order to surface and correct errors of law and justice. *See Harris*, 395 U.S. at 291 ("The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected."). The law is equally clear that the Court has broad habeas authority to enter any form of order, including providing interim relief and other declaratory or injunctive relief, where, as here, the requested relief directly compels or indirectly "affects" or hastens Petitioners' release from custody. *See Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973) (noting that habeas courts have the "power to fashion appropriate relief other than immediate release."); *Carafas v. LaVallee*, 391 U.S. 234, 239 (1968).

(finding 8 U.S.C. § 1226(a) to be the controlling statute regarding the detention or release of an individual who has passed his reasonable fear interview and is continuing to seek withholding of removal).  In addition, Respondents created a fictitious hearing date to make it impossible to seek relief even within the administrative system.  Pet. ¶ 71.

Indeed, as alleged throughout the Petition, each of the vague rationales offered to Petitioners and their counsel has been (and continues to be) a pretext for the plainly obvious, unlawful purpose of their detention, *i.e.*, to punish and coerce them to abandon their claims for immigration relief, and to deter other non-citizens from seeking similar relief, pursuant to the Trump Administration's "Zero Tolerance" policy targeting and traumatizing non-citizens.  This arrogation and abuse of executive power is precisely what the writ of habeas corpus is designed to remediate.  *See Boumediene*, 533 U.S. at 744 (the writ provides the judicial branch with the essential mechanism to check the "practice of arbitrary imprisonments" to "preserve[] limited government" and to protect against the "cyclical abuses" of power by the political branches).  Accordingly, the Court is vested with broad equitable authority to order relief of reunification or any form that is deemed just and proper, given the torture and irreparable harm as described in the Petition.  At a minimum, that relief should include a stay of removal of Petitioners to Honduras or to any district outside the Southern District of New York, which the All Writs Act fully authorizes in order to preserve this Court's jurisdiction over the pending petition.  *See* All Writs Act, 28 U.S.C. § 1651, *Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008) (citing cases) (temporarily enjoining transfer of habeas petitioner to Algeria in aid of jurisdiction).

## B.    Petitioners Are Likely To Succeed on Their Substantive and Procedural Due Process Claims

The Due Process Clause of the Fifth Amendment applies to all "persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or

permanent," and thus applies to the Petitioners. *Zadvydas v. Davis*, 533 U.S. 678, 679 (2001).

Here, Petitioners seek to vindicate both their substantive and procedural due process rights.

### 1.    Petitioners Ongoing Separation Violates their Substantive Due Process Right to Family Integrity.

Petitioners have substantive due process rights to be free from unlawful detention and to family reunification. The liberty interest at stake here, the right of father and son to be together, "has long been recognized as a fundamental right." *W.S.R. v. Sessions*, 318 F. Supp. 3d 1116, 1124 (N.D. Ill. 2018); *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000) (citing nearly 80 years of precedent and describing parents' rights "in the care, custody, and control of their children" to be "perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Ms. L. v. U.S. Immigration and Customs Enf't*, 302 F. Supp. 3d 1149, 1161 (S.D. Cal. 2018) ("it has long been settled that the liberty interest identified in the Fifth Amendment provides a right to family integrity or to familial association…there is no dispute the constitutional right to family integrity applies to aliens…").[7]

Because Mr. C. is in immigration custody, "the specific interest is a child's right to reunify with his parent in immigration custody…absent parental unfitness or danger to the child. That specifically and concretely described right is supported by the long line of cases…that established and continually reaffirm the fundamental right of a child to remain in the custody of a

---

[7] As part of the *Ms. L* litigation, a federal district court in the Southern District of California certified a class of adults who had been separated from their children at the border, and ordered DHS to reunify families, absent a finding that the parent was unfit or a danger to the child, by July. The class does not include any families where the parent has any kind of "criminal" history. *Id.* at 1139 n.5. The government argued in that case that "[a]ny parent separated from his or her child, but who is not a *Ms. L.* class member, may still be reunified with his or her child under existing processes, or if not reunified would need to file an individual action seeking reunification under his or her particular circumstances." Supplemental Briefing, *Ms. L. v. U.S. Immigration and Customs Enf't, et al.*, No. 3:18-cv-00428 (S.D. Cal Sept. 13, 2018) (Dkt. No. 223).

fit parent." *W.S.R.*, 318 F. Supp. 3d at 1126 (holding that there is "no doubt" that by forcibly separating fathers from their sons and keeping them apart, the government substantially interfered in their fundamental rights, and that such separation can only be "deemed arbitrary and conscious shocking").  Respondents have clearly, and intentionally, interfered with that fundamental right for no legitimate, let alone compelling, reason. There has been no allegation, and indeed no hearing or evidentiary showing, that Mr. C. is unfit to care for D.J.C.V.  *Stanley v. Illinois*, 405 U.S. 645 (1972).  That the government has no concerns with the reunification – so long as it occurs in Honduras – belies their claim that the best interest of this infant child is to be separated from his father.

> **2.    Petitioners' Detention Violates Their Substantive Due Process Right to be Free from Torture.**

Petitioners have a substantive due process right to be free from torture and/or other cruel, inhuman and degrading treatment.  Substantive due process "prevents the government from engaging in conduct that 'shocks the conscience.'"  *Salerno,* 481 U.S. at 746 (quoting *Rochin v. California,* 342 U.S. 165, 172 (1952)).[8]  It also prevents government conduct that "interferes with rights 'implicit in the concept of ordered liberty.'"  *Id.* (citing *Palko v. Connecticut,* 302 U.S. 319, 325-326 (1937)).  In addition, the Court has specifically classified torture as conscience-shocking conduct enjoined by substantive due process.  *See Palko*, 302 U.S. at 326 (noting that the Due Process Clause must at least "give protection against torture, physical or

---

[8] In *Salerno*, the Court held that the Bail Reform Act's authorization of pretrial detention based on future dangerousness does not violate substantive due process because pretrial detention is "carefully limit[ed]" to circumstances involving the "most serious of crimes"; arrestees are afforded a "prompt detention hearing"; and "maximum length of pretrial detention is limited by the stringent time limitations of the Speedy Trial Act."  481 U.S. at 747.  By contrast, Petitioners in this case have been detained for over five months without a bond hearing or any finding of dangerousness.

mental"); *see also Whitley v. Albers*, 475 U.S. 312, 327 (1986) ("[C]onduct that shocks the conscience or afford[s] brutality the cloak of law . . . violates the [Due Process Clause].").

Substantive due process enjoins the use of brutality against detained people, such as those subject to immigration detention, who are not covered by the Eighth Amendment. *See, e.g.*, *Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir. 1973) (Friendly, J.) ("It would be absurd to hold that a pretrial detainee has less constitutional protection against acts of prison guards than one who has been convicted."); *Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989) (Posner, J.) ("[I]f ever there were a strong case for 'substantive due process,' it would be a case in which a person who had been arrested but not charged or convicted was brutalized while in custody.").

The acts committed by Respondents against Petitioners meets the definitions of torture under U.S. law governing torture and war crimes, and under well-established international law. "[T]orture means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. § 2340(1). This includes "act[s] specifically intended to inflict severe physical or mental pain or suffering . . . for the purpose of . . . punishment, intimidation, coercion, or any reason based on discrimination of any kind." 18 U.S.C. § 2441(d)(1)(A) (War Crimes Act).[9] The term "severe mental pain or suffering" means "prolonged mental harm caused by or resulting from," among other things, "the intentional infliction or threatened infliction of severe physical pain or suffering," or "threatened" harm to the victims or third persons. 18 U.S.C. § 2340(2) (definitions applicable to 18 U.S.C. § 2340A (Anti-Torture Statute)); 18 U.S.C. § 2441(d)(2)(D) (incorporating definition from 18 U.S.C. § 2340(2)). *See also* Convention Against Torture and

---

[9] Cruel, inhuman or degrading treatment includes the intentional infliction of "severe *or serious* physical or mental pain or suffering." 18 U.S.C. § 2441(d)(B) (emphasis added).

14

Other Cruel, Inhuman or Degrading Treatment or Punishment art. 1, ¶ 1, GA Res. 39/46, (Dec. 10, 1984), *reprinted in* 23 ILM 1027 (1984), *as modified,* 24 ILM 535 (1985) (defining torture as including causing "severe pain or suffering, whether physical or mental," without the requirement to show prolonged mental harm).

Numerous bodies have observed that some of the most long-lasting and profound forms of cruelty are those inflicted on the psychological level. *See* Nigel Rodley, *The Treatment of Prisoners Under International Law*, 97-98 (3d ed. 2009) (collecting cases); *Xuncax v. Gramajo*, 886 F. Supp. 162, 170 (D. Mass 1995) (describing suffering of plaintiff who witnessed the torture or cruel treatment of his father and others and was made to believe his mother and siblings had been killed).

Separating a father from his two year old child – for five months running – would self-evidently inflict "severe mental pain or suffering" on both father and child, as well as prolonged mental harm on both.  As detailed in the Petition, children are likely to experience post-traumatic stress symptoms such as anxiety, terror, stress, and the damage can be permanent, especially where it occurs on top of trauma from the precarious journey to the United States.  The American Academy of Pediatrics has explained the real life harm suffered when a child is ripped away from his parent: "[H]ighly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short-and long-term health. This type of prolonged exposure to serious stress – known as toxic stress – can carry lifelong consequences for children."[10]  D.J.C.V. at the tender age of two, is likely to suffer from the effects of chronic and ongoing trauma, putting him at great risk of developing cognitive and

---

[10] Colleen A. Kraft, *AAP Statement Opposing Separation of Children and Parents at the Border*, American Academy of Pediatrics (May 5, 2018), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposingSeparationofChildrenandParents.aspx.

emotional impairments that could have lifelong consequences.  *See* Miriam Jordan, *A Migrant Boy Rejoins His Mother, But He's Not the Same*, N.Y. Times (July 31, 2018), https://www.nytimes.com/2018/07/31/us/migrant-children-separation-anxiety.html (reporting that "[d]ecades of research have concluded that children traumatically separated from their parents have a high likelihood of developing emotional problems, cognitive delays and long-term trauma," and that "[m]ore recent studies have found that separation can impair memory and normal production of cortisol, a hormone produced in response to stress.").

Petitioner D.J.C.V.'s guardian *ad litem* wrote that, "continued separation poses unacceptable risks to [D.J.C.V.'s] health and well-being.  [D.J.C.V.'s] separation from his father for the last five months has been traumatic and has taken a significant toll on [D.J.C.V.'s] health.  [D.J.C.V.] is very confused about why he is separated from his father, who he has had no contact with in months.  He continues to struggle to make sense of life in an ORR shelter without either of his parents."  She further stated that "[D.J.C.V.] needs his father's daily attention, care, and love.  So long as this separation keeps [D.J.C.V. from living and developing under his father's care, [D.J.C.V.'s] health, safety, and well-being will continue to suffer and will likely worsen."

Mr. C. is also suffering extreme anxiety, constantly worried about his son's well-being. He calls counsel at least twice per week, asking how D.J.C.V. is doing, and if there is any new information.  In the last few weeks, Mr. C. has been experiencing increasingly severe stomach pains and, recently, chest pains due to the anxiety about when he will ever see his child again. Mr. C. takes daily medication for depression since being detained, and often cries when he is alone in his cell, overwhelmed with concern for his son.

Respondents are no doubt aware of the psychological and physiological trauma and suffering caused by separating a child from a parent – it is a self-evident reality of every day

human life.  Even more, Respondents were explicitly warned by government officials of the
barbaric harms this policy would visit on children.  See Pet. at ¶81.  Thus, their decision to
continue family separation in the face of this knowledge, and in order to effectuate their
deterrence practice by coercively conditioning reunification on forfeiting their right to asylum
meets the demonstrates that the cruelty is for the purpose of  "punishment, intimidation,
coercion, or any reason based on discrimination of any kind."  18 U.S.C. § 2441(d)(1)(A) (War
Crimes Act).  Indeed, the Special Rapporteur on torture and other cruel, inhuman, or degrading
treatment or punishment has observed that ill-treatment may amount to torture if it is
intentionally imposed "for the purpose of deterring, intimidating or punishing migrants or their
families [or] coercing them into withdrawing their requests for asylum."[11]

### 3.   Petitioners Detention and Separation Violates Their Substantive Due Process Right to be Free from Purposeless or Punitive Non-Criminal Detention

Petitioners have a substantive due process right not to be detained for an improper
purpose, including for purposes of coercing them to abandon, or deterring others from attempting
to exercise, their rights under U.S. and international law to seek asylum or other immigration
protections. The Supreme Court has made clear that non-criminal detention must bear a
reasonable relationship to a valid governmental purpose.  *See Zadvydas*, 533 U.S. at 690-93;
*Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("due process requires that the nature and duration
of commitment bear some reasonable relation to the purpose for which the individual is
committed.").  In *Zadvydas*, the Court rejected an interpretation of the immigration detention
statute that would have permitted individuals whose removal was not possible in the foreseeable

---

[11] U.N. Hum. Rts. Council, *Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, ¶ 20, U.N. Doc. A/HRC/37/50 (Feb. 26, 2018), https://www.ohchr.org/Documents/Issues/Torture/A_HRC_37_50_EN.pdf.

future to be indefinitely detained *for the purpose of ensuring their appearance* in the event they became removable.  Because petitioners there were either stateless or rejected by their country of citizenship, removal was "no longer practically attainable," and therefore "detention no longer bore a "reasonable relation to the purpose for which the individual [was] committed." *Zadvydas*, 533 U.S. at 690 (quoting *Jackson*, 406 U.S. at 738).  The Court specifically noted that the challenged immigration detention statute did "not apply narrowly to 'a small segment of particularly dangerous individuals," for whom there had been an individualized finding of dangerousness to the public accompanied by "some other special circumstance, such as mental illness," and bounded by temporal limits, as was the case in various prior cases upholding non-criminal detention schemes for individuals who posed a threat to the public.  *Id*. at 691.  There has been no finding of public danger in this case.

No other legitimate purpose exists for the barbaric and punitive family separation that has been imposed on Petitioners here.  The government's desire to coerce a waiver of asylum rights, or to deter others not before it from traveling to the United States to exercise those same rights, is a patently invalid justification for separation of a father from his two-year old son and merits relief as a matter of law. *See, e.g., R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 189-90 (D.D.C. 2015) (finding government's desire to deter migration "insubstantial," and at odds with Supreme Court precedent holding "general deterrence" justifications impermissible); *see also* BIA Decision in Matter of D.A.M. (January 30, 2015)) at 2 (concluding that, notwithstanding Matter of D–J–, "the extraordinary remedy of the continued detention" of an El Salvadoran family unit could not be justified on the basis of "deter[ring] future waves of mass migration").  Where a detainee has already established a "reasonable fear" of persecution or torture, the notion that any such concerns might justify such punitive detention conditions is especially arbitrary. *Cf. id*. at 189

("general-deterrence rationale" particularly inapt where "neither those being detained nor those being deterred are certain wrongdoers, but rather individuals who may have legitimate claims to asylum in this country").

**4.     Petitioners' Forced Separation Without Notice or Opportunity to be Heard, Violates Their Right to Procedural Due Process.**

Separation of a parent from their child – and the threat to one of life's most intimate relationships – implicates due process and a right to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."); *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (Due Process "imposes a requirement that except in emergency circumstances, judicial process must be accorded both parent and child before removal of the child form his or her parent's custody may be effected.").

Accordingly, as other courts have found, Petitioner's procedural due process challenges are also likely to succeed on the merits. *J.S.R. v. Sessions*, No. 3:18-cv-1106, 2018 U.S. Dist. LEXIS 116653, at *23 (D. Conn. July 13, 2018) (finding that separated children plaintiffs were likely to succeed on the merits of establishing a constitutional violation, and noting that "parties agree that a constitutional violation occurred when the Government separated children from their parents—both on the basis of substantive due process, as the separation deprived the children of their right to family integrity, and procedural due process, as [the children] were given no notice and no fair opportunity for a hearing before being separated from their parents") (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (noting "absence of dispute reflect[ing] historical recognition that freedom of personal choice in matters of family life is a fundamental liberty

interest protected by the Fourteenth Amendment")).  Again, Respondents have not made a single

allegation, nor could they, about Mr. C.'s fitness as a father.

### C.    Respondents' Detention of a Young Child Away From His Father For Five Months Violates the Flores Settlement

D.J.C.V. challenges Respondents' placement decision forcibly separating him from his

father, without cause, pursuant to Paragraph 24B of the Flores Settlement Agreement (hereinafter

"FSA" or the "Settlement"), arising from longstanding litigation in the matter of *Flores v.*

*Sessions*, CV-85-4544 (C.D. Cal.).  The standard of review for placement decisions is "de novo."

*See* FSA ¶ 24C.

The Flores Agreement applies to "[a]ll minors who are detained in the legal custody of

the INS."  *See* FSA ¶ 10.  It "sets out nationwide policy for the detention, release, and treatment

of minors in the custody of the INS[.]"  *Id*. ¶ 9.  Immigration authorities must treat "all minors in

its custody with dignity, respect and special concern for their particular vulnerability as minors."

*Id*. ¶ 11.  D.J.C.V. is a class member of the FSA as he is a minor detained in the legal custody of

ORR/DHS.  Respondents are obligated to comply with the FSA, yet they continue to violate

numerous provisions of the agreement by keeping D.J.C.V. apart from his father.

### 1.    Respondents Failed to Detain D.J.C.V. in the Least Restrictive Setting as Required Pursuant to Paragraph 11 of the FSA Protections.

Paragraph 11 of the FSA requires that the government "shall place each detained minor in

the *least restrictive setting* appropriate to the minor's age and special needs, provided that such

setting is consistent with its interests to ensure the minor's timely appearance before the INS and

the immigration courts and to protect the minor's well-being and that of others."  The

government's policy to separate families completely ignores the dignity, respect and special

concern for minors.  Children such as D.J.C.V. are not placed in the least restrictive setting

appropriate when the child is apprehended with their parent.  *See Reno v. Flores*, 507 U.S. 292,

295 (1993).  Per the FSA, the government agreed "that the [government] must assure itself that

someone will care for those minors pending resolution of their deportation proceedings.  That is

easily done when the juvenile's parents have also been detained and the family can be released

together…"  Here, the least restrictive setting would be Petitioner D.J.C.V. at home with his

father, Mr. C., or, if that were not possible because Mr. C. remained in detention, then at

minimum a family detention center with Mr. C., it decidedly does not mean detention and foster

care.  Yet, the government continues to keep D.J.C.V. in detention and foster care, away from his

father for five months.

> **2.     There is a Preference, Which Respondents Ignore, to Release Minor from Custody to a Parent**

Pursuant to the FSA, Respondents must work to release a minor at all times, with

absolute priority being given to releasing the child to a parent.  FSA ¶ 14.  "Where the INS

determines that the detention of the minor is not required either to secure his or her timely

appearance before the INS or the immigration court, or to ensure the minor's safety or that of

others, the INS shall release a minor from its custody without unnecessary delay in the following

order of preference, to:

> a.  ***a parent***[12] (emphasis added);
> b.  a legal guardian;
> c.  an adult relative (brother, sister, aunt, uncle, or grandparent);
> d.  an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;
> e.  a licensed program willing to accept legal custody; or

---

[12] 8 C.F.R. § 1236.3(b)(iii) goes even further and spells out that if a juvenile and a parent are each in detention which is deemed mandatory, nonetheless they may be considered for release on a case-by-case basis. This Court retains authority to review placement as laid out in the instant complaint.

f.   an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility."

*See id.*

D.J.V.C.'s father, Mr. C. is, was and will be available to provide care for D.J.C.V. – a result D.J.C.V.'s guardian *ad litem* concluded was essential for the child's mental and physical well-being.  The government's forced separation policy and unlawful placement decision of D.J.C.V. is the only reason why this family has been separated, and Respondents have taken no meaningful attempts to reunite D.J.C.V. with his father, as required under the FSA.

Furthermore, the government's decision to separate D.J.C.V. from his father is arbitrary, lacking any objective discretionary determination, and instead is based on general animosity towards asylum-seeking families.  The separation also fails to ensure D.J.C.V.'s safety – in fact, it does exactly the opposite in continuing to inflict irreparable harm – or that he will appear before immigration authorities or the Court, which is best served in the custody of the accompanying parent entering the same asylum process.

The government's placement decision affects not only D.J.C.V.'s well-being, but also significantly hinders D.J.C.V.'s ability to seek legal protections.  Respondents' decision to place D.J.C.V. away from his father will force him to proceed through a difficult immigration court process alone (if he is ever given the opportunity to proceed with his asylum application) and without his father's critical support and testimony.

     **3.**     **Respondents' Indefinite Detention of D.J.V.C. Apart from His Parent with no Visitations or Telephone Calls Violates Paragraph 12 Protections.**

Paragraph 12 of the FSA requires that "[w]henever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing if applicable . . . and ventilation, adequate

supervision to protect minors from others, and contact with family members who were arrested

with the minor."  Respondents have failed to facilitate any contact between D.J.C.V. and his

father, Mr. C. during the entire separation period.  Despite ORR agreeing to facilitate visitation,

Respondents have not permitted a single interaction between father and child.

## III.    PETITIONERS WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS NOT GRANTED

Petitioners clearly meet that burden in establishing harm.  "A court will presume that a

movant has established irreparable harm in the absence of injunctive relief if the movant's claim

involves the alleged deprivation of a constitutional right."  *J.S.R.*, 2018 U.S. Dis. LEXIS 116653

at *14, *citing Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged

deprivation of a constitutional right is involved, most courts hold that no further showing of

irreparable injury is necessary.") (citations omitted); *see also Hernandez v. Sessions*, 872 F.3d

976, 994 (9th Cir. 2017) ("[i]t is well established that the deprivation of constitutional rights

unquestionably constitutes irreparable injury.") (internal quotations omitted); *Mills v. D.C.*, 571

F.3d 1304, 1312 (D.C. Cir. 2009) (It is well established that "the loss of constitutional freedoms,

for even minimal periods of time, unquestionably constitutes irreparable injury.").

Second, the injury here is real and obvious – a baby turned two years old in government

custody, and has been held by strangers away from the only father he has ever known.  Courts

have consistently held that separation of a parent from his child constitutes irreparable harm.

*Ms. L.* 310 F. Supp. 3d at 1146; *citing Leiva–Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir.

2011); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying "separated

families" as an irreparable harm); *W.S.R.*, 318 F. Supp. 3d at 1126("common sense would tell

anyone that keeping [Plaintiffs] separated from the only family they have in the United States –

in a facility where they have limited access to talk to their fathers and where very few people

speak their language – is causing irreparable harm"). And, the American Academy of Pediatrics has explained the real life harm suffered when a child is ripped away from his parent: "[f]ear and stress, particularly prolonged exposure to serious stress without the buffering protection afforded by stable, responsible relationship . . . can harm the developing brain and harm short-and long-term health."[13]  Specifically in this case, the federally appointed guardian *ad litem* for D.J.V.C. has repeatedly expressed serious concerns about D.J.V.C.'s wellbeing and the irreparable harmed that this prolonged separation is causing.  She stated that "[c]ontinued separation is likely to cause irreparable harm to this young child. . . D.J.C.V. is confused, and struggles to make sense of life in an ORR shelter."  And, as detailed above in the Petition, the psychological harm to a vulnerable two-year old child, could last a lifetime.  *See* Pet. at ¶¶ 79-80.

Petitioners meet this burden with respect to their right to seek asylum, withholding, and CAT protections as well. Without this Court's intervention, Petitioners have to choose between being detained and separated indefinitely to assert their claims, or giving up their rights to seek relief.  Either choice results in irreparable harm.[14]  Furthermore, the return to Honduras would likely be a death sentence for father and son.  Courts repeatedly recognize that the likelihood of violence is an important factor to a finding of irreparable harm. *See, e.g., Leiva-Perez*, 640 F.3d

---

[13] Letter from Colleen A. Kraft, MD, FAAP, President of the American Academy of Pediatrics, to DHS Secretary Nielsen (March 1, 2018), https://downloads.aap.org/DOFA/AAP%20Letter%20to%20DHS%20Secretary%2003-01-18.pdf.

[14] Court has enjoined government policies that "block[] access to an existing legal avenue for avoiding removal." *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 43-44 (D.D.C. 2017). Other courts have done the same. *See, e.g., Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998) (enjoining INS procedures allowing for deportation of aliens without a hearing as violative of constitutional due process); *Chhoeun v. Marin*, 306 F. Supp. 3d 1147, 1162 (C.D. Cal. 2018) (finding irreparable harm from deprivation of opportunity to contest removal). *See also Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) ("[T]his Court has reiterated that deportation is 'a particularly severe penalty,' which may be of greater concern to a convicted alien than 'any potential jail sentence.").

at 969 (granting stay of removal and noting "the likelihood of [violence] . . . should be part of the irreparable harm inquiry" in the asylum context); *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, at 1163 (D. Or. 2018) (recognizing importance of due process at the credible fear interview stage due to the "serious harm—including persecution, torture, and death—that may result if asylum is improperly denied").

## IV.  THE BALANCE OF EQUITIES FAVORS GRANTING THE PRELIMINARY INJUNCTION

Furthermore, the balance of equities also favors granting Petitioners' request for a preliminary injunction as, contrary to the real and severe harm inflicted on an infant and his father due to their separation, Respondents have not articulated any harm in reuniting Mr. C. and his son.  In fact, the only reason the government currently articulates for its inability to reunite the family is that, for vaguely stated "safety" reasons, it cannot house Mr. C. and D.J.C.V. in a family detention center due to Mr. C.'s eight-year-old misdemeanor conviction.  The government has not articulated any concern that Mr. C. presents a danger to his child, nor could it.  In fact, it has stated it would reunite Petitioners for the purpose of deportation, so it clearly does not perceive Mr. C. to present any danger to caring for a very young child.  The guardian *ad litem* came to a similar conclusion: Mr. C. presents no danger to a young and very vulnerable child.  Yet, the government simultaneously argues that, while not a danger to a pre-verbal baby as a primary caregiver, Mr. C. would somehow present a danger to others in the family detention facility.  This defies logic. In addition, the government ignores other available remedies, including conditional release of Mr. C. as permitted by the INA.  *Guerra*, 831 F.3d at 64 (finding 8 U.S.C. § 1226(a) to be the controlling statute regarding the detention or release of an individual who has passed his reasonable fear interview and is continuing to seek withholding of removal).

Given D.J.C.V.'s tender age, the amount of time Mr. C. has already spent detained and separated from his father, Respondents' continually changing position as to Mr. C. and his son, and the complete failure by the Respondents to articulate a legitimate reason for the separation, the balance of equities "favors accelerated reunification."  *W.S.R.*, 318 F. Supp. 3d at 1127 (finding "balance of equities favors accelerated reunification" where separation of nine and sixteen-year-old boys from their fathers was shown to be causing harm to their mental health, absent allegations of parental unfitness or danger posed by father to a child, the government must reunite father and son within 72 hours of the order").

## V.    THE PUBLIC INTEREST FAVORS GRANTING THE PRELIMINARY INJUNCTION

The public has an interest in protecting statutory and constitutional rights. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Innovation Law Lab*, 310 F. Supp. 3d at 1163; *Hernandez*, 872 F.3d at 996 (finding that "[t]he public interest benefits from an injunction that ensures that individuals are not deprived of their liberty and held in immigration detention" due to unconstitutional processes).  "[W]hen a plaintiff establishes 'a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction.'" *Ms. L.*, 310 F. Supp. 3d at 1147, citing *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).  It is in the interest of the public to uphold these protected rights, "especially when there are no adequate remedies available." *Id.* at 1149 (internal citation omitted).

<u>CONCLUSION</u>

For the foregoing reasons, Petitioners respectfully request the Court to enter an order:

A.  Preliminarily releasing from custody and permanently enjoining Respondents from
continuing to separate D.J.C.V. from Mr. C. pending the resolution of these proceedings

and final resolution of their asylum, withholding, or Convention Against Torture

("CAT") applications or other immigration proceedings, and exhaustion of all

administrative and judicial appeals;

B.  Preliminarily and permanently enjoining Respondents from removing either Mr. C. or

D.J.C.V. from the United States until they are reunited and each have had a full and fair

opportunity to pursue their asylum, withholding, or CAT applications or other

immigration proceedings, and exhaustion of all administrative and judicial appeals;

C.  Enjoining Respondents from moving Mr. C. or D.J.C.V., or their immigration cases, from

the Southern District of New York pending the resolution of these proceedings and final

resolution of their asylum, withholding, or CAT applications or other immigration

proceedings, and exhaustion of all administrative and judicial appeals; and

D.  D. Requiring Respondents to facilitate frequent and ongoing visitation and contact

between Petitioners until both are physically released and reunified.


Dated: New York, New York
      October 4, 2018             MORGAN, LEWIS & BOCKIUS LLP


                                          By:_____/s/_____
                                          Carolyn A. Silane
                                          101 Park Avenue
                                          New York, NY 10178-0600
                                          Tel: 212.309.6000
                                          Fax: 212.309.6001
                                          carolyn.silane@morganlewis.com

                                          Baher Azmy, bazmy@ccrjustice.org
                                          J. Wells Dixon, wdixon@ccrjustice.org
                                          Shayana Kadidal, kadidal@ccrjustice.org
                                          Ghita Schwarz, gschwarz@ccrjustice.org
                                          CENTER FOR CONSTITUTIONAL RIGHTS
                                          666 Broadway, Floor 7

New York NY 10012
Tel: 212.614.6427
Fax: 212.614.6499

*Attorneys for the Petitioners*